CONWED CORPORATION, a
Delaware corporation,
Plaintiff,

v.

UNION CARBIDE CHEMICALS AND
PLASTICS COMPANY, INC. (f/k/a
Union Carbide Corporation), a New
York corporation, Defendant and
Third–Party Plaintiff,

v.

MacArthur Company, a Minnesota
corporation, Third–Party
Defendant.

No. CX–00–2200.

Supreme Court of Minnesota.

Oct. 4, 2001.

Stich, Angell, Kreidler, Brownson & Ballou, P.A., Robert D. Brownson, Louise A. Behrendt, Kristi K. Warner, Minneapolis, Rudnick & Wolfe, Michael Goldman, Chicago, IL, for plaintiff.

Foley & Lardner, Trevor Will, Mark Velguth, Michael Rosenberg, Milwaukee, WI, Cousineau, McGuire & Anderson, Michael Barrett, James Waldhauser, Thomas Kieslbach, Minneapolis, for defendant.

Pustorino, Pederson, Tilton & Parrington, Jonathan P. Parrington, Minneapolis, MN, for third-party-defendant.

## OPINION

BLATZ, Chief Justice.

The issues before this court arise from five certified questions from the United States District Court for the District of Minnesota regarding plaintiff-employer Conwed Corporation's right to bring claims against a former asbestos manufacturer under Minn.Stat. § 176.061 of the Minnesota Workers' Compensation Act. Conwed seeks to recover from Union Carbide Chemicals and Plastics Company for workers' compensation benefits paid to employees who were exposed to Union Carbide's asbestos while working in Conwed's ceiling tile plant between 1965 and 1974. Additionally, Conwed seeks to recover amounts it may be liable to pay in the future for employees who have settled claims with Conwed but may seek additional benefits as their illnesses worsen, who are sick but have not sought workers' compensation benefits, and who have no manifested symptoms but may become sick. The certified questions ask whether Conwed may recover these amounts, whether it may prove its claims on behalf of all employees as a single claim or several categories of claims, and whether Conwed is entitled to prejudgment interest on any amounts it recovers.

We hold that Conwed may bring subrogation claims only on behalf of identified employees who have a compensable injury and to whom Conwed has a present duty to pay workers' compensation benefits. We also hold that Conwed is entitled to seek prejudgment interest and answer the five certified questions in accordance with these holdings.

From 1965 to July 1974, Conwed used Union Carbide's Calidria, a chrysotile asbestos fiber, to make ceiling tiles in Conwed's Cloquet, Minnesota plant. Although Conwed also obtained asbestos fibers from other sources, an estimated 75% of the amount used during this period was Union Carbide's Calidria. In or around 1986, Conwed, which is self-insured, began receiving asbestos-related workers' compensation claims from former Cloquet-plant employees who were exposed to asbestos. By its estimate, Conwed has paid a total of about $4 million to date to approximately 278 former employees.

On June 12, 1992, Conwed filed an action in United States District Court for the District of Minnesota under Minn.Stat. § 176.061 to recover tort damages from Union Carbide. In February 1993, the case was transferred to the Eastern District of Pennsylvania for pretrial handling of nationwide asbestos litigation. The case was transferred back to Minnesota in June 2000. Discovery has been ongoing since 1992.

Conwed asserts in this action that its medical research and discovery indicate it will have to pay a great deal more in future workers' compensation benefits to many of its former employees. To support its claims, Conwed retained Dr. Philip Harber, an occupational medicine and pulmonary epidemiologist from the UCLA School of Medicine. Dr. Harber reviewed Conwed's employment records and looked at the medical records of 215 employees who had brought workers' compensation claims. He then identified approximately

1,854 employees who were exposed to asbestos at Conwed's plant for at least six months during the time Conwed used Union Carbide's Calidria. Dr. Harber projected a high occurrence of compensable disease based on exposure to airborne asbestos at one of three rates he and Conwed deemed conservative.[1]

To prove that Conwed would be financially liable for virtually all of these illnesses, Conwed retained retired Minnesota Assistant Chief Administrative Law Judge Jack Wallraff as an expert witness. Having reviewed Conwed's prior workers' compensation settlements and legal precedent stemming from unrelated asbestos litigation, Judge Wallraff is prepared to testify "concerning the possibility of future monetary exposure to Conwed," and will render an opinion that Conwed will be liable for virtually all workers' compensation claims resulting from the 1965–1974 use of Union Carbide's Calidria.

In August 2000, Union Carbide made several dispositive motions, including a motion to dismiss for failure to state a claim upon which relief can be granted based on Conwed's failure to list in its complaint each individual employee for whom it seeks payment. In two partial summary judgment motions, Union Carbide sought first to "preclud[e] Conwed from seeking to recover estimates of future payments to hypothetical claimants," and second, to prevent Conwed from recovering prejudgment interest from Union Carbide. In a November 2000 hearing on the motions, Judge Donald D. Alsop of the United States District Court for the District of Minnesota orally declined to grant the motion to dismiss, but did not rule on the other motions. Instead, Judge Alsop proposed certifying questions to this court and, after obtaining the parties' input, ultimately certified the following five questions as determinative of the issues in this case and without controlling authority in Minnesota law: [2]

1. Can an employer pursuing a claim under Minn.Stat. § 176.061, subd. 5 and subd. 7 against an alleged third party tortfeasor collect payments that the employer expects to pay in the future to employees who have filed workers' compensation claims when the employer has settled with the employees and the settlement is subject to being reopened should the employees' injuries progress beyond what was provided for in the settlement?

2. Can an employer pursuing a claim under Minn.Stat. § 176.061, subd. 5 and subd. 7 against an alleged third party tortfeasor collect payments that based on scientific projections the employer expects to pay in the future to known employees already exposed to a hazardous substance, when the disease resulting from such exposure is latent and the employees are not yet physically disabled making them currently eligible to file workers' compensation claims?

---

1. Dr. Harber projected the effects of asbestos exposure at rates of 1 fiber greater than 5 microns in length per cubic centimeter (f/cc) of air, 5 f/cc of air, and 10 f/cc of air, as compared to previous testing completed by Conwed and Union Carbide generally showing higher rates of asbestos levels. In Union Carbide laboratory tests, average airborne asbestos dust levels ranged from 12.9 f/cc of air to 43.4 f/cc of air. In the only testing done in the Cloquet plant, Union Carbide's tests showed a range of 1.9 f/cc of air to 5.5 f/cc of air. Studies in other plants and laboratories showed a range of 3.3 f/cc of air to 83.8 f/cc of air, depending on the site and testing methods used.

2. These questions are restated verbatim from the certification order but have been renumbered pursuant to this court's power under Minn.Stat. § 480.065, subd. 4 (2000).

3. Can an employer pursuing a claim under Minn.Stat. § 176.061, subd. 5 and subd. 7 against an alleged third party tortfeasor collect payments that based on scientific projections the employer expects to pay in the future to known employees exposed to a hazardous substance when the employees are physically disabled from such exposure and currently eligible to file workers' compensation claims, but have not yet filed workers' compensation claims?

4. Does Minn.Stat. § 176.061 allow an employer to prove a claim for subrogation against an alleged third party tortfeasor on behalf of a substantial number of employees as one claim or several categories of claims, rather than proving the claims of hundreds or thousands of employees individually, when the employees' injuries and the harms to which they were exposed were similar?

5. Does Minn.Stat. § 549.09, subd. [1](b)(1) permit an employer to collect prejudgment interest when the employer is pursuing a third party claim under Minn.Stat. § 176.061 against an alleged third party tortfeasor?

Certified questions are matters of law that we review de novo. *In re Butler*, 552 N.W.2d 226, 229 (Minn.1996). We have recognized that provisions of Minnesota's workers' compensation statute should not be construed in isolation, but must be considered in light of related provisions of the statute. *Allstate Ins. Co. v. Eagle-Picher Indus.*, 410 N.W.2d 324, 327 (Minn.1987).

I.

It is useful to begin with an overview of the subrogation rights created and preserved by the Minnesota Workers' Compensation Act, which is codified at Minn. Stat. ch. 176 (2000). Under the Act, every employer is liable to pay compensation for an employee's personal injury or death arising out of and in the course of employment. Minn.Stat. § 176.021, subd. 1 (2000). The employer's liability under the Act "is exclusive and in the place of any other liability to such employee." Minn. Stat. § 176.031 (2000).

When a compensable injury is caused by a party other than the employer, the Act gives the employee a right to workers' compensation benefits from the employer while preserving the employee's common law right of action against the tortfeasor. *Gleason v. Geary*, 214 Minn. 499, 507, 8 N.W.2d 808, 812 (1943); Minn. Stat. § 176.061, subd. 5 (2000). Furthermore, an employer who pays workers' compensation benefits to an employee injured by a third party's negligence is ordinarily entitled to bring a subrogation action against the third party and seek reimbursement for those payments. *Gleason*, 214 Minn. at 507, 8 N.W.2d at 812. The applicable portion of Minn.Stat. § 176.061, subd. 5 provides:

> If an injury or death for which benefits are payable is caused under circumstances which created a legal liability for damages on the part of a party other than the employer, * * * legal proceedings may be taken * * * by the employer * * * against the other party to recover damages * * *.

Minnesota Statutes § 176.061, subd. 5(a) goes on to state in relevant part:

> If the injured employee or the employee's dependents or any party on their behalf receives benefits from the employer * * * or institutes proceedings to recover benefits or accepts from the employer * * * any payment on account of the benefits, the employer * * * is subrogated to the rights of the employee or the employee's dependents * * *.

 Under subdivision 5(a), the employer may join in a tort action brought by the employee or may bring a separate action, but as a subrogee, the employer is entitled to no greater rights than the employee-subrogor has. *Kaiser v. Northern States Power Co.*, 353 N.W.2d 899, 903 (Minn.1984). Any action brought under subdivision 5(a), whether controlled by the employee, the employee's dependents, or the employer, is for the primary benefit of the employee or the employee's dependents.[3] *See Nyquist v. Batcher*, 235 Minn. 491, 496, 51 N.W.2d 566, 570 (1952) (discussing Minn.Stat. § 176.06, subd. 2 (1952), which was repealed and replaced by Minn. Stat. § 176.061, subd. 5). If the employer-subrogee brings or continues such an action, the employer effectively "becomes a trustee for the benefit of the compensation beneficiaries as to any damages recovered in excess of the compensation liabilities and costs of collection." *Id.* at 499, 51 N.W.2d at 571. Damages recovered in third-party actions are distributed according to a statutory formula that allocates roughly one-third of a plaintiff-employee's tort recovery to the employee after deduction of the expenses of collection, the remainder to reimburse the employer for compensation paid, and any balance remaining thereafter to the employee with a credit to the employer against future compensation payable. Minn.Stat. § 176.061, subd. 6 (2000); *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 837 (Minn. 1988).[4]

 In addition to its subrogation rights under subdivisions 5 and 5(a), an employer has a separate cause of action under Minn.Stat. § 176.061, subd. 7 (2000) for medical expenses and "'other compensation payable.'" *See Allstate*, 410 N.W.2d at 326 (quoting Minn.Stat. § 176.061, subd. 7). Subdivision 7 states:

> [T]he employer * * * has a separate additional cause of action against the third party to recover any amounts paid for medical treatment or for other compensation payable under this section resulting from the negligence of the third party[.] * * * [T]he amount recovered by suit or otherwise as reimbursement for medical expenses or other compensa-

---

**3.** Unlike Minn.Stat. § 176.061, subd. 5(a), subdivision 5(b) gives the employer the right to bring suit on its own behalf for the recovery of an increase in workers' compensation premiums and does not require the employer to allocate a portion of the recovery to the employee. *See* Minn.Stat. § 176.061, subds. 5(b), 6 (2000). Neither party mentions workers' compensation premiums or subdivision 5(b) in its briefs, but each focuses instead on the fact that "Conwed's claims against Union Carbide are claims for subrogation under the Minnesota Workers' Compensation Act * * *." Thus, to the extent Conwed, which is self-insured and does not pay workers' compensation premiums, brought this suit under subdivision 5, its subrogation action is based on the employee's suit brought under clause (a). Furthermore, there is nothing in the record regarding a charge to Conwed's earnings based on liability for future damages. For these reasons, we reject the dissent's reasoning based on subdivision 5(b) and Conwed's potential charge to earnings.

**4.** Application of the distribution formula may be avoided in two situations: First, where the employee, after notice to the employer, settles with the defendant tortfeasor for items of damage not subject to the employer's subrogation right, the "employee waives his statutory right to one-third of the employer's net recovery from the third-party." *Naig v. Bloomington Sanitation*, 258 N.W.2d 891, 894 (Minn.1977). Second, in a "reverse-*Naig*," where the employer settles the subrogation claim with the third party prior to the commencement of trial in the employee's direct tort suit, the employer "waives any rights it might have to the employee's subsequent recovery, specifically, the right to claim a portion of the employee's recovery as a credit against future compensation payable." *Folstad v. Eder*, 467 N.W.2d 608, 612 (Minn. 1991).

tion shall be for the benefit of the employer * * * to the extent that the employer * * * has paid or will be required to pay compensation or pay for medical treatment of the injured employee and does not affect the amount of periodic compensation to be paid.

Although subdivision 7 creates a separate cause of action in the employer, it does not alter "the allocation of employer and employee rights inherent in the statutory scheme of section 176.061." *Hodder*, 426 N.W.2d at 838. The employer's recovery is still subject to the subdivision 6 distribution formula. *Hodder*, 426 N.W.2d at 838.

## II.

 Against this backdrop, we begin with Certified Question No. 1 and determine whether Conwed may seek payment from Union Carbide for compensation that may eventually be payable to employees who have settled workers' compensation claims subject to reopening if their conditions should worsen.[5] Union Carbide has acknowledged that "[t]o the extent there are any cases where Conwed has paid claimants but not fully settled the existing injury," Conwed can recover future "payable" benefits for those workers if Conwed can provide sufficient evidence of the benefits it will have to pay. Based on our prior case law, we conclude that this is the correct result. *See Aetna Life & Cas. v. Anderson*, 310 N.W.2d 91, 95 (Minn.1981) (holding that employer's insurer who provided workers' compensation benefits to employee but did not consent to employee's settlement with third-party tortfeasor may "maintain an action for payments that become payable in the future"); *see also Wilken v. Int'l Harvester*, 363 N.W.2d 763, 767–68 (Minn.1985) (holding that a trial court should calculate an employer's contribution due for the third party's future payments by using affidavits and other evidence to determine a lump sum amount and reduce the amount to its present value as of the date of the contribution judgment); *Metro. Milk Co. v. Minneapolis St. Ry.*, 149 Minn. 181, 184, 183 N.W. 830, 831 (1921) ("The employer is not required to wait until all payments due to the employ[ee] or the dependent have been made and then sue at law."). Thus, to the extent Certified Question No. 1 asks whether, under Minn.Stat. § 176.061, Conwed may recover for benefits it has paid or expects to pay following settlements for existing claims based on existing illnesses that may worsen,[6] we answer it in the affirmative.

---

5. Prior to 1992, Minn.Stat. § 176.461 (1990) provided that a settlement award could be vacated "for cause" and our case law identified "cause" as fraud, mistake, newly discovered evidence, or substantial change in the employee's condition. *See, e.g., Krebsbach v. Lake Lillian Coop. Creamery Ass'n*, 350 N.W.2d 349, 353 (Minn.1984). As amended in 1992, the section now says that "cause" is limited to: "(1) a mutual mistake of fact; (2) newly discovered evidence; (3) fraud; or (4) a substantial change in medical condition since the time of the award that was clearly not anticipated and could not reasonably have been anticipated at the time of the award." Act of April 28, 1992, ch. 510, art. 2, § 11, 1992 Minn. Laws 589, 603, codified at Minn. Stat. § 176.461 (2000). The law in effect at the time of settlement governs. *Franke v.*

*Fabcon, Inc.*, 509 N.W.2d 373, 377 (Minn. 1993).

6. There is some dispute between the parties as to whether Certified Question No. 1 addresses final settlements that may be "reopened" because the employee has developed a wholly new illness—if, for example, an employee has fully settled a claim for mesothelioma but later also develops lung cancer from the same exposure. Union Carbide asserts that Conwed cannot seek payment for such unknown injuries because the damages to the employee would be purely speculative. Conwed claims that the damages are not speculative because the research of its medical experts accurately predicts what injuries will occur and at what rate. This argument between the parties can be reduced to whether

### III.

At issue in Certified Question No. 2 is whether the employer has a cause of action against the third party under Minn. Stat. § 176.061 when the employee has not manifested symptoms of asbestos-related disease. We conclude that the employer's claims against the third party are derived from the employee's compensable injury and the employer's obligation to pay workers' compensation benefits—not from the employer's assertion of future monetary exposure based on a statistical likelihood of future illness.[7] We therefore hold that Conwed may not recover from Union Carbide for this category of employees.[8]

"Normally, when an employer and its insurer have paid workers' compensation to the *injured* employee, the employer is subrogated to the right of the employee to recover from the third-party tortfea-sors." *Keenan v. Hydra–Mac, Inc.*, 434 N.W.2d 463, 465 (Minn.1989) (emphasis added) (citing *Liberty Mut. Ins. Co. v. Nutting Truck & Caster Co.*, 295 Minn. 211, 215, 203 N.W.2d 542, 544 (1973)); *see also* Minn.Stat. § 176.061, subd. 5(a). Conwed argues that its workers' injuries occurred at the time of their last significant exposure to asbestos and that such exposure created a legal liability in Conwed, thereby giving Conwed the present right to bring a subrogation suit against Union Carbide. We disagree.

As a general rule, an employee's cause of action for workers' compensation benefits stemming from an occupational disease does not accrue at the time of exposure, but rather when the employee suffers disablement, meaning that the employee's illness has led to a wage loss, job transfer, or permanent impairment. *Still-*

---

Conwed may collect payments based on scientific projections regarding the likelihood of its employees developing illnesses in the future and actually bringing claims for new compensation. These issues are addressed in response to Certified Question Nos. 2 and 3.

7. Consequently, the dissent's reliance on our decision in *Sentinel Management Co. v. Aetna Casualty & Surety Co.*, 615 N.W.2d 819 (Minn. 2000), is unfounded. *Sentinel* did not involve subrogation or the Workers' Compensation Act, but was instead about the *present* direct physical loss to the insureds' buildings as a result of past asbestos contamination. 615 N.W.2d at 822.

8. Despite the dissent's conclusion that Minn. Stat. § 176.061 allows an employer to "directly maintain" its own action independent of its employees, Conwed has specifically acknowledged that it "does not press innovative 'direct claims,' but relies upon well-established subrogation law in the workers' compensation context." We are mindful of the dissent's concerns about situations in which an employer may be left with an inadequate remedy and the strain a multiplicity of lawsuits would have on our judicial resources, but judicial recognition of an inde-pendent cause of action for a charge to earnings is neither supported by the record nor the statutory scheme and would not obviate the specter of 1,639 separate lawsuits. Conwed's intent is to either settle or try its claim according to *Tyroll v. Private Label Chemicals, Inc.*, 505 N.W.2d 54 (Minn.1993), which allegedly supports Conwed's intent to leave the employees to bring their own claims. However, *Tyroll* involved issues relating to an employer's subrogation action after the employee had made a pretrial *Naig* settlement. *Tyroll*, 505 N.W.2d at 56. *Tyroll* therefore does not support judicial recognition of a separate cause of action in the employer for damages occasioned by the third party. Moreover, recognition of such a cause of action raises questions about the source and nature of the third-party's separate duty to the employer and, if grounded in negligence, the presence of fault in the respective parties. *See, e.g., Hartford Accident & Indem. Co. v. Oceancarrier*, 799 F.2d 1093, 1096 (5th Cir.1986) (discussing the material differences between the employer's direct and derivative actions against the third-party tortfeasor). The claim Conwed pursues here is predicated on a breach of duty Union Carbide allegedly owed to Conwed's employees, not to Conwed itself.

son v. Peterson & Hede Co., 454 N.W.2d 430, 433 (Minn.1990) (wage loss); *Flint v. Am. Can Co.*, 426 N.W.2d 190, 191 (Minn. 1988) (functional impairment); *Moes v. City of St. Paul*, 402 N.W.2d 520, 527 (Minn.1987) (job transfer); *see also* Minn. Stat. § 176.66, subd. 1 (2000) ("The disablement of an employee resulting from an occupational disease shall be regarded as a personal injury within the meaning of the workers' compensation law."). Moreover, because damage is an essential element of an employee's tort claim against a third party, the absence of a physical manifestation of illness will result in dismissal of the employee's tort action for failure to state a claim. *Dalton v. Dow Chem. Co.*, 280 Minn. 147, 152–53, 158 N.W.2d 580, 583–84 (1968) (holding that the employee's third-party tort claim stemming from the employee's occupational disease does not accrue, and the statute of limitations does not begin to run, until the occupational disease begins to manifest itself).

Thus, the employee does not have an actionable claim against either the employer or the third party when the employee's illness has not manifested itself. Based on the fundamental principle that in a subrogation suit the employer has no greater rights than the employee has, neither the employee's tort or workers' compensation suits nor the employer's subrogation suit have accrued where the employee has not suffered a compensable injury, as herein described. *See Metro. Transit Comm'n v. Bachman's*, 311 N.W.2d 852, 854 (Minn. 1981) (citing Minn.Stat. § 176.061, subd. 5 for the proposition that the employer's right to recover is no greater than the employee's right).

Nothing in Minn.Stat. § 176.061, subd. 7 changes this basic precept that an employer's third-party claim depends on the employee's compensable injury. *See* 6 Arthur Larson & Lex K. Larson, *Larson's Work-*ers' Compensation Law § 116.03 (2000) ("After all, it is the employee's injury and cause of action."). Subdivision 7 is built on the initial and explicit recognition that the employer's duties are to the injured employee. *See* Minn.Stat. § 176.061, subd. 7. Based upon this foundation, the subdivision goes on to state that the amount the employer recovers from the third party shall be for the benefit of the employer to the extent the employer "has paid or will be required to pay compensation or pay for medical treatment of the *injured* employee * * *." *Id.* (emphasis added). Because subdivision 7, like subdivision 5, predicates the employer's third-party claim on the employee's compensable injury, an employer may not pursue a subrogation claim independent of that injury. We answer Certified Question No. 2 in the negative.

## IV.

Certified Question No. 3 asks whether Conwed's suit against Union Carbide may predate the workers' compensation claims of former employees who have developed asbestos-related illnesses but have not yet sought workers' compensation benefits. Conwed argues that it has a presently actionable legal claim based on the language in section 176.061, subdivision 7 and this court's precedent discussing "compensation payable" in the future. *See* Minn. Stat. § 176.061, subd. 7 ("[T]he employer * * * has a separate additional cause of action against the third party to recover any amounts paid for medical treatment or for other *compensation payable* under this section resulting from the negligence of the third party * * *." (Emphasis added)); *Allstate*, 410 N.W.2d at 327 (recognizing that section 176.061, subdivision 7, "which accords the employer a separate cause of action, also extends that action to compensation not yet payable").

As the most direct support for its argument, Conwed relies on the following language from *McDonough v. Muska Electric Co.:*

> An employer's obligation to pay benefits * * * exists at the time of the work-related injury, regardless of negligence. Thus, the subrogation rights also exist prior to commencement of a workers' compensation claim although most certainly there are practical difficulties in asserting a subrogation right before a worker seeks benefits.

486 N.W.2d 768, 770–71 (Minn.1992) (citation to *Allstate*, 410 N.W.2d at 327–28, omitted). According to Conwed, subdivision 7 allows an employer to pursue for its own benefit a subrogation action to recover damages for future monetary exposure based on the medical likelihood of disease for a "population" of workers.

We believe Conwed overstates the breadth of subdivision 7. We previously addressed the employer's independent cause of action for medical expenses under subdivision 7 in the context of the Minnesota Automobile Insurance No–Fault Act. *See Travelers Ins. Co. v. Springer*, 289 N.W.2d 131 (Minn.1979). In *Springer*, we said that the purpose of subdivision 7 was to give the employer or the employer's insurer its own cause of action for medical expenses where the ordinary principles of subrogation prevented the employer from recovering these expenses because the No–Fault Act prevented the employee

from recovering them. 289 N.W.2d at 133–34. Because subdivision 7 mentioned medical expenses but not compensation, a gap existed between the amount the employer paid as a result of the tortfeasor's negligence and the amount the employer could recover from the tortfeasor.[9] *Bachman's*, 311 N.W.2d at 854.

■ Following our decisions in *Springer* and *Bachman's*, the legislature expanded subdivision 7 to cover "other compensation payable" in addition to medical expenses. Act of June 7, 1983, ch. 290, § 35, 1983 Minn. Laws 1310, 1334–35. "By this amendment, the legislature meant to extend *Springer* to insure the employer's right to recover nonmedical compensatory benefits as well as medical expenses in instances where the employee's right to recover tort damages is barred by the no-fault act." *Hodder*, 426 N.W.2d at 838 (citing *Allstate*, 410 N.W.2d at 326, 327). In other words, the primary function of subdivision 7 is to provide an employer a separate cause of action for medical expenses, wage loss benefits paid in lieu of no-fault benefits, and wage loss benefits paid "even though the employee may be barred from pursuing his own cause of action because [of] a failure to meet one of the threshold limitations of the No–Fault Act." *Minnesota Workers' Compensation Deskbook* § 16.5B (Jay T. Hartman & Thomas D. Mottaz, eds., Minn. CLE 2d ed.1997). To date, we have not extended subdivision 7 to an action not involving the No–Fault Act.

---

**9.** As we explained in *Bachman's:*

Under the "uniform system" of workers' compensation and no-fault insurance, the payment of workers' compensation benefits is primary. Thus, when an employee receives benefits under workers' compensation and no-fault, the no-fault benefits must be reduced by the amount of workers' compensation benefits paid. Because the no-fault act requires that workers' compensation benefits be deducted from any of the

employee's recovery, [the] employee could not have recovered nonmedical temporary total disability benefit payments from [the third party]. Since [the employer] is entitled to no greater rights than its employee, it follows that [the employer's] claim for reimbursement of its disability benefit payments was properly dismissed.

311 N.W.2d at 854–55 (internal citations omitted).

Furthermore, "section 176.061, taken as a whole, presents a comprehensive plan for asserting the claims of both employer and employee against third parties and for distributing any sums recovered." *Allstate*, 410 N.W.2d at 327. According to Professor Larson, an effective subrogation provision accomplishes such a comprehensive plan and results in "the third party paying what it would normally pay if no compensation question were involved; the employer and carrier 'coming out even' by being reimbursed for their compensation expenditure; and the employee getting any excess of the damage recovery over compensation." Larson & Larson, *supra*, § 116.02. "[B]oth the employee and the carrier have to be afforded a fair opportunity to press the damage suit," but employees may need a "little special solicitude" to ensure that they act on their rights; therefore, a good statute provides "an incentive to sue the third party, and particularly to strive for the fullest possible damage recovery." *Id.*

To read subdivision 7 as recommended by Conwed would not only subject third-party defendants to multiple lawsuits but also would undermine the comprehensive plan in section 176.061. As we said in *Hodder:*

> Employers could in the future entirely bypass the subdivision 6 allocation by suing out their "separate additional" cause of action; if the subdivision 6 formula does not apply to any of the employer's subrogation interest, the employee would no longer be assured of at least recovering for himself one-third of the tort recovery after expenses. Nor would employers have to share equitably in the employee's cost of recovery. We

think this result is neither desirable nor was it intended.

426 N.W.2d at 838. For these reasons, we will not give subdivision 7 the meaning Conwed suggests.

We further reject Conwed's argument that *Allstate* and *McDonough* require a different result. First, *Allstate* involved an employee who was both sick and had filed a workers' compensation claim. 410 N.W.2d at 325. It is therefore of little help in defining whether an obligation for compensation payable exists when there is no past or present obligation to pay workers' compensation benefits.

Second, the language in *McDonough* must be taken in context. In that case, two employees suffering from occupational diseases entered *Naig* settlements with the third-party tortfeasor without notifying their employer's insurer. *McDonough*, 486 N.W.2d at 769. At the time the employees brought their claim against the tortfeasor, their injuries were not compensable under the Workers' Compensation Act. *McDonough*, 486 N.W.2d at 770. Due to a change in the law, the employees' workers' compensation claims matured prior to settlement with the third party, but they neither notified their employer nor filed workers' compensation claims against the employer until after the settlement.[10] *Id.* Ultimately, we held that an employee with a compensable injury has a duty to notify the employer when settling a tort claim against a third party regardless of whether a workers' compensation claim has been filed. *Id.* at 770–71. Even though a third-party plaintiff in a subdivision 5 action has a duty to notify a subrogee of a pending settlement prior to commencement of a claim for workers' compensation, it does not follow that sub-

---

10. It was not disputed that the employees' injuries were sufficient to sustain such a claim after the law changed so long as the

failure to give the employer notice of the settlement did not bar the claim. *McDonough,* 486 N.W.2d at 770.

division 7 permits an employer-plaintiff to sever what would otherwise be a subdivision 5 subrogation interest and bypass the subdivision 6 allocation. Thus, we hold that the language and history of subdivision 7 warrant answering Certified Question No. 3 in the negative to the extent it asks whether Conwed may recover from Union Carbide for workers' compensation benefits Conwed has no present duty to pay to injured employees.

## V.

Turning then to Certified Question No. 4, we are asked to determine whether "Minn.Stat. § 176.061 allow[s] an employer to prove a claim for subrogation against an alleged third party tortfeasor on behalf of a substantial number of employees as one claim or several categories of claims, rather than proving the claims of hundreds or thousands of employees individually, when the employees' injuries and the harms to which they were exposed were similar." As framed, this question appears to ask about the proper way to handle Conwed's claims and Union Carbide's defenses, and is a question of trial management best left to the trial judge. To the extent this question asks whether Conwed must make employee-specific claims, we answer in the affirmative.

 An action against a third-party tortfeasor may be maintained by the employee, by the employee's dependents in case of death, or by the employer in its own name or in the name of the employee. Minn.Stat. § 176.061, subd. 5(a). Should the court deem it advisable, either the employer or employee may intervene in the other's action for the purpose of protecting their respective interests, and either may continue an action not diligently prosecuted by the other. *Id.* As previously indicated, "the right to proceed against a third party which is preserved for the employe[e], or for his dependents, * * * is for the primary benefit of such employe[e] or his dependents," and the plaintiff-employer holds any recovery as a trustee for the compensation beneficiaries. *Nyquist*, 235 Minn. at 498, 51 N.W.2d at 571. As a practical matter, then, Conwed's employees need to be identified so that the employees may have notice and an opportunity to intervene, and so that damages recovered, if any, may be distributed according to the statutory formula. Accordingly, we answer Certified Question No. 4 by leaving the federal court to divide the employees into reasonably related groups if it so chooses, but requiring Conwed to identify the employees within each group in order to state an actionable claim.[11]

## VI.

 Certified Question No. 5 asks whether Conwed is entitled to prejudg-

---

11. Although Conwed claims that it has the present ability to identify each employee, it argues that requiring the parties to follow this course will waste judicial resources and require the continual relitigation of claims long after memories have faded and witnesses have died. Union Carbide conceded at oral argument, however, that its own conduct may not need to be litigated repeatedly, and points out that Conwed has been incurring workers' compensation claims at an average of only about three per year since December 1996. In addition, we have not said that Conwed must wait to bring future claims against Un-

ion Carbide until it has actually paid all the money due to former employees who have sought workers' compensation benefits. If the parties go to trial, Conwed may, subject to the federal court's discretion, group its claims and seek subrogation recovery from Union Carbide however early and often it deems necessary to minimize the onus of litigation, so long as it only seeks recovery relating to employees who became disabled as a result of an occupational disease arising out of and in the course of their employment with Conwed. *See* Minn.Stat. § 176.021, subd. 1.

ment interest under Minn.Stat. § 549.09, subd. 1(b)(1) (2000) in its subrogation action against Union Carbide. Although this certified question references only Minn. Stat. § 549.09, Union Carbide first relies on Minn.Stat. § 176.061, subd. 6(d) for the proposition that an employer that has paid workers' compensation benefits is not entitled to prejudgment interest from the third-party tortfeasor. Section 176.061, subdivision 6 sets forth in subsections (a) through (d) the scheme for allocating damages due from a third-party tortfeasor. Specifically, Minn.Stat. § 176.061, subd. 6(d) states:

> Any balance remaining shall be paid to the employee or the employee's dependents, and shall be a credit to the employer * * * for any benefits which the employer * * * is obligated to pay, but has not paid, and for any benefits that the employer * * * is obligated to make in the future.
>
> *There shall be no reimbursement or credit to the employer * * * for interest or penalties.*

(Emphasis added.)

According to Union Carbide, the last sentence of this subdivision prevents Conwed from collecting any interest—prejudgment or otherwise—from Union Carbide. In support of this argument, Union Carbide relies on *Hahn v. Tri–Line Farmers Co-op,* in which the Minnesota Court of Appeals "decline[d] to overrule the trial court's literal interpretation of the plain language" of subdivision 6(d) and held that employers are prohibited from seeking prejudgment interest from third-party tortfeasors. 478 N.W.2d 515, 527 (Minn. App.1991), *rev. denied* (Minn. Jan. 27, 1992). Union Carbide asks this court to

adopt this interpretation of subdivision 6(d).

We decline to do so, as the last sentence of Minn.Stat. § 176.061, subd. 6(d) must be read in the proper context. All of subdivision 6 refers to the allocation of the damage award; it is unlikely that the last sentence of the last subdivision inexplicably turns to providing instruction on the calculation of the damage award. Moreover, the first sentence of subdivision 6(d) states that the remainder of a damage award must be paid to the employee subject to a credit to the employer for benefits owed but not paid. It follows that the second sentence bans credits or reimbursement, and therefore a reduction in the employee's allocation, for interest or penalties the employer must pay because of its own fault.[12] Consequently, we conclude that Minn.Stat. § 176.061, subd. 6(d) is irrelevant to the prejudgment interest question.

Certified Question No. 5 is expressly centered on Minn.Stat. § 549.09, subd. 1(b), which reads:

> Except as otherwise provided by contract or allowed by law, preverdict, preaward, or prereport interest shall not be awarded on the following:
>
> (1) judgments, awards, or benefits in workers' compensation cases, but not including third-party actions * * *.

Union Carbide argues that Conwed may not recover prejudgment interest under subdivision 1(b)(1) and, in doing so, relies on the Minnesota Court of Appeals' holding in *S.B. Foot Tanning Co. v. Piotrowski* that a subrogation action is not a third-party action. 554 N.W.2d 413, 420–21 (Minn.App.), *rev. denied* (Minn. Dec. 17,

---

**12.** Such interest and penalties might include additional compensation paid to the employee as a penalty for inexcusable delay in the payment of benefits, Minn.Stat. § 176.225, subd. 5 (2000) or for interest paid to another employer or insurer in a dispute over liability, Minn.Stat. § 176.191, subd. 3 (2000).

1996). In *Piotrowski*, the court of appeals reversed the trial court's award of pre-judgment interest to the employer in its subrogation action against the third-party tortfeasor, concluding that:

> Although the underlying action in this case is [the employee's] suit against a third-party tortfeasor, [the employer's] action to collect its subrogation interest was brought pursuant to the workers' compensation statute. Thus, Minn.Stat. § 549.09, subd. 1(b)(1), applies to prohibit an award of prejudgment interest in this case.

*Piotrowski*, 554 N.W.2d at 421 (citation omitted). Based on this holding, Union Carbide argues that subdivision 1(b)(1) prohibits the recovery of prejudgment interest in the employer's subrogation action, which, unlike the employee's direct suit against the tortfeasor, is purely statutory, does not stem from the common law, and is not a true third-party claim.

We find nothing in section 549.09, subdivision 1(b)(1) that distinguishes between a third-party action that existed at common law and one that is a creature of statute. Subdivision 1(b)(1) deals exclusively with workers' compensation suits; thus, according to a plain reading, the phrase "workers' compensation actions, but not including third-party actions" refers to any third-party action that arises in the context of the workers' compensation statute. Under Minn.Stat. § 176.061, subds. 5, 6, and 7, either an employee or an employer may bring a tort action against a third party, and both the employee's direct action and the employer's subrogation action are to some extent controlled by the workers' compensation statute. *See, e.g.,* Minn. Stat. § 176.061, subd. 6 (allocating damage awards between the employee and employer for third-party tort actions brought by either the employee or employer).

Even if the true third-party action were the employee's suit against the third-party tortfeasor, the employer's subrogation suit is also against the third party and is founded upon the employee's right to tort recovery from the third party. Because the employee's claim always provides the underpinning for the employer's subrogation action and because the employee is undisputedly entitled to prejudgment interest, the plain meaning of subdivision 1(b)(1) warrants the award of prejudgment interest on benefits recovered in the employer's subrogation action. Certified Question No. 5 is answered in the affirmative.

Certified questions answered.

GILBERT, Justice (concurring in part and dissenting in part).

I concur with the majority opinion in regard to prejudgment interest, but I respectfully dissent from the remainder of the opinion. The practical effect of the majority opinion will prolong these proceedings and require an endless series of up to 1,639 separate subrogation claims. Each claim will be fraught with separate statute of limitation disputes and faded memories of witnesses trying to recall what happened years before. This will cause considerable strain on our judicial system and increase all parties' costs of litigation. Since Conwed produced credible and unrefuted expert scientific testimony, as the plaintiffs did in *Sentinel Management Co. v. Aetna Casualty & Surety Co.*, 615 N.W.2d 819 (Minn.2000), it should be allowed to proceed now with its claims. Conwed's expert merely extrapolated from the number of known asbestos-related diseases currently manifested in Conwed employees to project the number of future manifestations. As in *Sentinel*, where the plaintiffs' expert extrapolated from positive asbestos samples from 5 rental units in an apartment building to conclude that

all 450 units were contaminated with asbestos, the expert's extrapolation regarding the likelihood of Conwed's employees developing a compensable illness in the future should go to the weight, rather than to the admissibility of his testimony. *See Sentinel*, 615 N.W.2d at 824.

The timing for these claims is especially important in this case because it appears that Union Carbide Chemicals and Plastics Company (Union Carbide) is trying to have it both ways procedurally. On the one hand, Union Carbide has pleaded the statute of limitations as an affirmative defense against Conwed's claim in the underlying action in U.S. District Court. In that proceeding, Union Carbide is arguing that Conwed has waited too long and its claim should be time barred. Then, in this case, to the contrary, Union Carbide is arguing that Conwed's subrogation claims are premature or have been brought too soon because no payments under the Workers' Compensation Act have actually been made and some claims have not yet been filed. However, in this case, although a *Frye–Mack* type hearing has not yet been held, *see generally Sentinel*, 615 N.W.2d at 824 (describing such a test), there is credible evidence indicating that Conwed has been exposed to a potentially significant asbestos contamination related workers' compensation liability. There is obviously a major factual dispute as to the injury and amount, but these issues would be resolved by the fact finder. Minnesota Statutes § 176.061 (2000) relates to third-party liability, and subdivision 5 provides a cumulative remedy for damages to either the employee or the employer to directly maintain that action.

Minnesota Statutes § 176.061, subd. 5(a) specifically provides that the employer is subrogated to the rights of the employee or has a right to indemnification when benefits have been paid or a proceeding has been instituted. We have held that under these circumstances, the employer is subrogated to the rights of its employee to the extent of compensation paid, the employer is entitled to no greater rights than the employee, and that an employer's carrier has no right of indemnity independent of its right of subrogation. *Kaiser v. Northern States Power Co.*, 353 N.W.2d 899, 903 (Minn.1984). We have further held that such subrogation claims are limited to recovery of common law damages for past and future wage loss, loss of earning capacity and medical expenses. *Tyroll v. Private Label Chems., Inc.*, 505 N.W.2d 54, 60 (Minn.1993). However, we have never addressed the rights of an employer to maintain a separate action in the name of the employee or employer against a third-party tortfeasor for the recovery of damages where the employee has been exposed to asbestos, which causes latent diseases, but the employee has not yet commenced a claim and payments have not yet been paid. Here we have allegations of potential future workers' compensation claims based on a known but latent and delayed liability. In this case, the employer may have already incurred damages as a self-insured employer and suffered lost profits based on future anticipated workers' compensation liability.[1] Thus, if it

---

1. Although the financial statements or discovery responses were not before us at oral argument, counsel for Conwed, in response to a question as to whether Conwed had taken a charge to earnings based on potential future workers' compensation benefits exposure Conwed might have, answered that he could not answer that question exactly but that it is something that is reported annually and that it had been requested by Union Carbide in discovery. There is obviously a factual question in regard to the amount, but this is a discoverable and quantifiable element of damages that should be left to the fact finder, especially based on the limited procedural

elects to proceed under Minn.Stat. § 176.061, subd. 5(b), an employer has a claim against the other party for recovery of premiums incurred even though some of the employees have not received benefits or instituted claims. In this case, Conwed desires to prove damages through expert, scientific testimony addressing probabilities of having to pay out future workers' compensation benefits to injured employees.[2]

Minnesota Statutes § 176.061, subd. 5 provides an employer the right to recover damages "notwithstanding the payment of benefits by the employer * * * or their liability to pay benefits." Minn.Stat. § 176.061, subd. 5. The employer's rights do not stop with subrogation and indemnity theories of recovery, and the underlying complaint in the U.S. District Court makes claims beyond subrogation.[3] Specifically, the statute also allows the employer or the attorney general in the event the employee does not proceed with its claim against the other party to "maintain a separate action or continue an action already instituted" in the name of the employee and the name of the employee's dependents or in the name of the employer or in the name of the attorney general on behalf of the special compensation fund "against the other party for the recovery of damages." *Id.,* subd. 5(a). If the employer commences such an action, the employee may move to intervene as a direct party in that action. *Id.* All proceeds after fees and costs are to be distributed to the employees in accordance with subdivision 6. *Id.* The majority opinion avoids discussing this second statutory scenario, which empowers the employer to institute a proceeding on behalf of the employee, in a separate action, with distribution of any proceeds to be governed by Minn.Stat. § 176.061, subd. 6. In a footnote, the majority reasons that it is not necessary to discuss this issue because of a statement Conwed made that it is not pressing innovative direct claims like the plaintiffs in *Group Health Plan, Inc. v. Philip Morris, Inc.,* 621 N.W.2d 2 (Minn. 2001), or *State by Humphrey v. Philip Morris, Inc.,* 551 N.W.2d 490 (Minn.1996). However, in *Group Health* and *Humphrey,* the HMOs were seeking standing to recover costs for increased healthcare services they provided to their members as a result of tobacco-related illnesses from smoking cigarettes, relying on numerous substantive statutes. *Group Health,* 621 N.W.2d at 4; *Humphrey,* 551 N.W.2d at 496. Contrary to the new theories of recovery pled in the *Group Health* and *Humphrey* cases, the employer in this case has been granted standing by the legislature to institute a separate action in either the employer's or employee's name against the other party to recover damages. Minn. Stat. § 176.061, subd. 5(a).[4]

and factual record that is before this court on certification.

**2.** Conwed is not seeking damages for pain and suffering, general disability, embarrassment, disfigurement and mental anguish.

**3.** There are two additional counts alleging damages that have been or in the future will be caused to be paid for workers' compensation benefits, which include costs and expenses in excess of $50,000 for negligence, negligent representation, failure to warn and strict liability.

**4.** Furthermore, as mentioned and by way of example, the damage claims allowed in Minn. Stat. § 176.061 go beyond merely workers' compensation benefits paid to an employee or ones based only on commenced legal proceedings. Subdivision 5(b) for instance provides:

If an employer, being then insured, sustains damages due to a change in workers' compensation insurance premiums, whether by a failure to achieve a decrease or by a retroactive or prospective increase, as a result of the injury or death of an employee which was caused under circumstances

Conwed has the burden of proof to put forth evidence that it has been damaged. Its claim for future losses is not unlike other tort actions based on expert testimony, which routinely assess future damages for wage loss, loss of earning capacity, pain and suffering, future disability, and estimated medical expenses. Credible evidence has been put forth in support of such workers' compensation based claims and will have to withstand cross-examination and rebuttal evidence.

Conwed's evidence consists not only of expert scientific testimony, but ample evidence that other employees working in the same plant, at the same time, have developed significant compensable diseases under the Workers' Compensation Act. Already, 215 Conwed employees have filed separate workers' compensation claims based on diseases they contracted from the asbestos contamination in the plant where they all worked. Conwed has paid out approximately 4 million dollars in benefits to 161 of those filing these claims. Conwed estimates that the projected damage exposure for the remaining 1,639 employees ranges between 44.3 and 71.3 million dollars.

This asbestos contamination occurred when Union Carbide allegedly sold approximately 7,300 tons of Calidvia asbestos to Conwed between 1965 and July of 1974. The asbestos was incorporated by Conwed into certain ceiling tile products manufactured by Conwed. An epidemiologic study of Conwed workers completed in 1987 found that those workers demonstrated a high frequency of pulmonary abnormalities associated with asbestos exposure.[5]

Dr. Philip Harber, a preeminent occupational medicine and asbestos epidemiologist from UCLA School of Medicine, conducted a research project into the future health experience and workers' compensation costs associated with the Conwed workers as a result of their exposure to Union Carbide's Calidria asbestos. Dr. Harber prepared a scientific projection of the future asbestos-related symptoms that will occur among the Conwed employees as a result of exposure to Union Carbide's asbestos. These projections were based on the experience that had already occurred and was prepared only for those workers who had been employed for a substantial period of time while Union Carbide asbestos was supplied to Conwed. Dr. Harber then prepared annual projections, based on epidemiologic models and data, for the asbestos-related disease experience among Conwed workers from 1989 to the year 2030. As discussed earlier, this extrapolation from already existing asbestos-related disease experience to predict future experience provides adequate support for Conwed to proceed with its claims.

which created a legal liability for damages on the part of a party other than the employer, the employer, notwithstanding other remedies provided, may maintain an action against the other party for recovery of the premiums. This cause of action may be brought either by joining in an action described in clause (a) or by a separate action. Damages recovered under this clause are for the benefit of the employer and the provisions of subdivision 6 are not applicable to the damages.

In this case, Conwed may have sustained some damages as an approved self-insurer under Minnesota Workers' Compensation law. These damages are over and above workers' compensation benefits and are equivalent to a change in workers' compensation premiums an insured employer would incur under similar circumstances.

5. *See* Thomas G. Robins, MD, MPH & Margaret A. Green, MD, MPH, *Respiratory Morbidity in Workers Exposed to Asbestos in the Primary Manufacture of Building Materials*, 14 Am. J. Indus. Med., 433 (1988).

The third party, the alleged tortfeasor, can defend this as a tort claim, not a workers' compensation claim. Consequently, as we previously have held, it is correct to say that the ultimate damages recoverable in an employer's subrogation suit are the benefits paid and payable, it is also correct to say that those damages are to be recovered out of the common law tort damages in which the third-party tortfeasor is first found responsible. *See Tyroll,* 505 N.W.2d at 60. The inevitability and amount are subject to vigorous debate but the cause of action for "any benefits which the employer * * * is obligated to make in the future," Minn.Stat. § 176.061, subd. 6(d), remains for the employer directly or by the employer in the employee's name, and is not only based on "the employer's obligation to pay workers' compensation benefits" as held by the majority in this case.

Subdivision 6 further reinforces the right to a separate cause of action against the other party that an employer has. It provides a distribution formula for reimbursement of costs of collection including payment of attorney fees; for one-third of the remainder to be paid to the injured employee without being subject to any right of subrogation; for reimbursement of the employer, out of the balance remaining, in an amount equal to all benefits paid under this chapter or on behalf of the employee or the employee's dependents by the employer; and for the remaining balances to be paid to the employee or employee's dependents. *Id.,* subd. 6. After the costs of collection, the employees receive all the proceeds, with the employer gaining a credit for any workers' compensation benefits it is obligated to pay, but has not paid, and for any benefits that the employer or the special compensation fund is obligated to make in the future. *Id.* Importantly, subdivision 6(b) provided payment of one-third of the remainder to

an injured employee "without being subject to any right of subrogation." *Id.,* subd. 6(b). This language is another significant legislative indicator of an employer's right of action irrespective of subrogation.

Similarly, subdivision 7 grants an employer "a separate additional cause of action against the third party" relating to medical treatment for the direct benefit of the employer "to the extent that the employer or the special compensation fund has paid or *will be required to pay* compensation or pay for medical treatment of the injured employee * * *." *Id.,* subd 7. (emphasis added). This element ("will be required to pay") is a factual matter traditionally left to the sound discretion of a fact finder, not an appellate court. Minn. Stat. § 176.061, subd. 5(a) allows the employer to prove the employee's compensable injury. Conwed has presented substantial expert testimony, which is better assessed by a fact finder in terms of its weight, rather than an appellate court in terms of its admissibility.

The *Hodder* case cited by the majority in relation to subdivision 7 is nondispositive, and the reference to the subdivision 6 distribution formula supports Conwed's claim rather than eliminates it. The majority cites *Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826 (Minn.1988), to the extent that an employer's recovery is still subject to the subdivision 6 distribution formula. However, immediately following that proposition, we held in *Hodder* that "[i]n those instances where the employee does not or cannot maintain a third-party action, subdivision 7 continues to give the employer, as in *Springer,* the right to recover its benefits paid and payable." *Hodder,* 426 N.W.2d at 838 (citing *Travelers Ins. Co. v. Springer,* 289 N.W.2d 131 (Minn.1979)).

The statutory damage framework encompasses both future benefits exposure plus changes in workers' compensation insurance premiums. Minn.Stat. § 176.061, subd. 5(b). The statute specifically permits the employer to bring employees' workers' compensation claims in the name of the employer. *Id.*, subd. 5(a). The employer is allowed to proceed on its own, or, in essence, to stand in the place of each individual employee, and to offer testimony through its experts as to injury and benefits. Additionally, the amounts an employer may be entitled to are part of the factual equation. A jury might have to contend with determining issues such as physical manifestation and the dollar amount of exposure to future benefits, life expectancy, premium changes, or equivalent damage for a self-insured employer, etc. but, again, these are factual questions. The majority simply assumes that because an employee has neither been paid benefits nor commenced an action, the injury or illness has not manifested itself.

As in any litigation involving proof of causation and the prediction of future damages, there are always difficulties of proof, and both parties face some risk. Conwed's risk may be that a judgment now would be less than its ultimate exposure, and then it would have no further subrogation right in indemnification claims. A fact finder may not believe the experts based on the fact that a large number of employees have not yet filed claims or manifested symptoms of asbestos-related diseases. Credibility of experts will no doubt affect the ultimate outcome. Union Carbide could put forth strong arguments that may tend to diminish or eliminate Conwed's claims in the eyes of a jury. Union Carbide's risk is that they are assessed a damage amount that exceeds what Conwed will actually pay out. Maybe Conwed decided to proceed now, being mindful of these risks but desiring to seek a resolution of its claim while memories are still fresh. Union Carbide obviously desires to defer not only a decision, but the requirement of making a payment now, and would rather divide the claims into a series of separate subrogation and indemnity claims. Neither option is perfect, but a jury and trial court are better equipped to weigh and consider these countervailing facts, arguments, and probabilities.

We have previously decided how an employer's future workers' compensation contribution can be determined. It is to be reduced to its present value as of the date of the contribution judgment in the tort action and the contribution claim is to be paid in a single, lump sum payment. *Wilken v. International Harvester Co.,* 363 N.W.2d 763, 767 (Minn.1985). In so deciding, we emphasized the advantages of a final one-time resolution of the contribution claim at the time of the judgment and noted that these kinds of contribution claims should not linger on for the lifetime of the employee. *Id.* We also responded to the inherent difficulty of proof by stating that "[t]he contribution award, like the tort verdict, necessarily involves approximations based on reasonable assumptions. True, the employee next year may die or recover, but these uncertainties do not prevent the measurement of a lump sum verdict against the third-party tortfeasor." *Id.* at 767–68. As we suggested in *Wilken,* special interrogatories could be submitted to the jury for a separate finding on liability, causation, and damages. *Id.* at 768. Then the court could apply an appropriate discount factor, by affidavit, to determine a present value of this claim. *Id.*

Accordingly, the certified questions should be answered in the affirmative. We should recommend that the U.S. District Court hold a *Frye–Mack* hearing on this state law question and determine

whether the scientific evidence offered is generally accepted in the relevant scientific community; and whether the particular scientific evidence in this case has shown to have foundational reliability. *Goeb v. Tharaldson*, 615 N.W.2d 800, 815 (2000). The U.S. District Court's vast experience in dealing with mass tort claims analyzed in the context of *Sentinel* and *Goeb* should be able to resolve Conwed's claims in an expeditious and fair manner for all the parties, in one proceeding, rather than potentially spreading hundreds of separate subrogation claims into the courts through the years.