Sharon NELSON, Petitioner, Appellant,

v.

**AMERICAN FAMILY INSURANCE GROUP, Respondent.**

No. C4–01–226.

Supreme Court of Minnesota.

Aug. 29, 2002.

Rehearing Denied Oct. 9, 2002.

Daniel L. Giles, Christenson, Stoneberg, Giles & Stroup, P.A., Marshall, for appellant.

Richard Dale, Sioux Falls, SD, for respondent.

# OPINION

ANDERSON, PAUL H., Justice.

Appellant Sharon Nelson commenced this action in Murray County District Court to recover no-fault benefits from respondent American Family Insurance Group. Both parties brought motions for summary judgment. The court granted American Family's motion and dismissed Nelson's claim on the grounds that any recovery would be a double recovery and would frustrate the purpose of the No-Fault Act. The Minnesota Court of Appeals affirmed. We reverse.

Sharon Nelson was involved in an automobile accident in Minnesota on March 2, 1990. At the time of the accident, she was insured by American Family Insurance Group. Following this accident, Nelson received $20,000 in no-fault income loss benefits, the maximum payable under the limits of her American Family policy. Approximately 14 months later, on May 16, 1991, Nelson was involved in a second automobile accident, which occurred in South Dakota. American Family was still Nelson's insurer at the time of the second accident, but this time it denied her no-fault claims in part on the ground that she had not yet returned to work after the first accident.

After being denied no-fault benefits for the second accident, Nelson commenced a personal injury action in South Dakota against the tortfeasor to recover damages for this accident. Coincidentally, Nelson's no-fault insurer, American Family, was also the insurer for the South Dakota tortfeasor. Six years after the accident and three years after bringing her South Da-

kota action, Nelson prevailed in a jury trial. *Nelson v. Erickson*, No. 94–1604 (Second Judicial Circuit Court, Minnehaha County, S.D. Mar. 12, 1997) (jury verdict). Along with other damages, the jury awarded Nelson $37,000 for past income loss and American Family paid this amount in full in its capacity as the tortfeasor's insurer. Nelson's recovery for past income loss was subject to a one-third contingency fee arrangement with her attorney, resulting in Nelson receiving a net amount of $24,666.67.

Nelson then commenced this action in Minnesota against American Family to recover future medical expenses and past income loss caused by the second accident. American Family asserted the defenses of claim preclusion, issue preclusion, accord and satisfaction, and payment. The parties settled Nelson's no-fault claims for future medical expenses, but were unable to resolve her claim for past income loss. The parties subsequently brought cross motions for summary judgment on stipulated facts. The district court granted American Family's motion and dismissed Nelson's complaint. The court explained its reasoning in a memorandum, stating that (1) Nelson had a no-fault policy limit of $20,000 for loss of income; (2) Nelson had been awarded $37,000 for past income loss; and (3) any further award or recovery for loss of income would frustrate the purpose of the No-Fault Act by allowing a double recovery.

Nelson appealed, characterizing her action as a simple breach of contract case and asserting that the No-Fault Act does not prevent a double recovery in every case. Nelson specifically argued that even if no-fault benefits had been paid prior to the verdict, there would be no comparable set-off in South Dakota because South Dakota does not have offset and subrogation provisions comparable to those found in

Minnesota's No–Fault Act. Nelson first asserted that she was entitled to receive the entire $20,000 no-fault benefit for past income loss because she had $37,000 of income loss at the time of the South Dakota trial. In the alternative, Nelson argued that she was partially uncompensated for her total $37,000 judgment for past income loss because after subtracting attorney fees, she was left with only $24,666.67 as a net recovery. Nelson argued that she was uncompensated for $12,333.33, but acknowledged that she was entitled to recover only $10,483.33 because under the No Fault Act, an injured party is entitled to income loss benefits at 85% of the actual loss. Minn.Stat. § 65B.44, subd. 3 (2000). Nelson arrived at $10,483.33 by applying this 85% limitation to the amount of $12,333.33. Finally, Nelson argued that her claim was not barred by accord and satisfaction, claim preclusion, or issue preclusion.

The court of appeals affirmed, agreeing with the district court that Nelson was seeking a double recovery. *Nelson v. Am. Family Ins. Group*, 632 N.W.2d 264, 268 (Minn.App.2001). First, the court of appeals concluded that the No–Fault Act precluded double recoveries, regardless of their label. Next, the court concluded that the South Dakota judgment was a foreign judgment that did not alter the result. The court went on to dismiss Nelson's argument that, because of the one-third contingency fee arrangement, the South Dakota judgment did not fully compensate her. Finally, the court did not address the applicability of claim preclusion, issue preclusion, or accord and satisfaction. On appeal to this court, Nelson raises the single issue of whether she is entitled to no-fault benefits for that part of her past income loss that she argues remains uncompensated because of the one-third contingency fee paid to her attorney.

## I.

The issue presented in this case involves interpretation of the No–Fault Act and examination of a district court's grant of summary judgment on undisputed facts. Statutory interpretation is a question of law, which this court reviews de novo. *See Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 393 (Minn.1998). Similarly, when a district court grants summary judgment based on the application of a statute to undisputed facts, the result is a legal conclusion that is reviewed de novo. *Lefto v. Hoggsbreath Enters., Inc.*, 581 N.W.2d 855, 856 (Minn. 1998).

### A. Relevant Provisions of Minnesota's No–Fault Act

Minnesota's No–Fault Act, Minn.Stat. §§ 65B.41–.71 (2000), contains a statement of purpose, which provides in pertinent part that the Act's purposes are:

(1) To *relieve the severe economic distress* of uncompensated victims of automobile accidents * * *;

(2) To *prevent the overcompensation* of those automobile accident victims suffering minor injuries by restricting the right to recover general damages to cases of serious injury;

(3) To encourage appropriate medical and rehabilitation treatment of the automobile accident victim by *assuring prompt payment* for such treatment;

(4) To *speed the administration of justice*, to *ease the burden of litigation* on the courts of this state * * *;

(5) To * * * *provide offsets to avoid duplicate recovery* * * *.

Minn.Stat. § 65B.42 (emphasis added). We heed these stated purposes when we construe the No–Fault Act. *See* Minn.Stat. § 645.16 (2000) (requiring courts to interpret statutes according to the legislative

intent); *see also Scheibel v. Illinois Farmers Ins. Co.*, 615 N.W.2d 34, 38 (Minn.2000) (interpreting the No–Fault Act according to its stated purposes).

When an insured person suffers injuries arising out of the maintenance or use of a motor vehicle, that person is entitled to "basic economic loss benefits," which include medical expense benefits and income loss benefits. Minn.Stat. § 65B.44, subd. 1. The Act requires minimum insurance coverage of $20,000 in medical expense benefits and $20,000 in income loss benefits. *Id.* Income loss benefits are to be paid at "85 percent of the injured person's loss of present and future gross income * * * to a maximum of $250 per week." Minn.Stat. § 65B.44, subd. 3. The statute also provides that "[o]verdue payments shall bear simple interest at the rate of 15 percent" per year. Minn.Stat. § 65B.54, subd. 2.

When an insured receives benefits under the No–Fault Act, the insured's ability to recover similar benefits in tort is subject to an offset provision as follows:

> With respect to a cause of action in negligence * * * the court shall deduct from any recovery the value of basic or optional economic loss benefits paid or payable, or which would be payable but for any applicable deductible.

Minn.Stat. § 65B.51, subd. 1. Further, the Act provides that the no-fault insurer has a right of subrogation when the accident occurs in another state:

> [The no-fault insurer] paying or obligated to pay basic or optional economic loss benefits is subrogated to the claim for the recovery of damages for economic

loss that the [no-fault recipient] has against another person whose negligence in another state was the direct and proximate cause of the injury for which the basic economic loss benefits were paid or payable. This right of subrogation exists only to the extent that basic economic loss benefits are paid or payable and only to the extent that recovery on the claim absent subrogation would produce a duplication of benefits or reimbursement of the same loss.

Minn.Stat. § 65B.53, subd. 2.

■ The Act also provides that the no-fault insurer's right of subrogation is enforceable only when the no-fault insurer agrees to pay the insured's attorney fees in such a proportion as the amount of the subrogation interest bears to the amount of the ultimate recovery. *Id.*, subd. 8. In essence, this provision requires that if the no-fault insurer asserts a subrogation interest in the insured's tort recovery, the no-fault insurer must pay a proportionate share of the attorney fees for the amount of the tort recovery that is duplicative of the no-fault benefits. The result of this provision is that the insured bears the cost of attorney fees for only that part of the recovery over and above the previously paid no-fault benefits.[1]

### B. *The Parties' Arguments*

■ In the instant case, the parties present a single set of contrary alternatives for interpreting the No–Fault Act—calculation of no-fault benefits based on net tort recovery, or no further recovery.

---

**1.** Essentially, the no-fault insurer pays a proportion of the insured's fees equivalent to the ratio of the judgment for the tort recovery to the subrogation interest. For example, if the insured recovers $30,000 in a tort judgment and the no-fault insurer had a subrogation interest of $10,000, the no-fault insurer is responsible for one-third of the insured's attorney fees.

Neither of these alternatives fully acknowledges the Act's scheme for coordination and reconciliation of no-fault and tort recoveries or properly achieves the full purposes of the Act. As explained more fully below, American Family's result would impose on Nelson the cost of recovering in her tort action amounts that essentially represent the no-fault benefits covered by her American Family policy. Conversely, Nelson's resolution would improperly shift to American Family her costs of recovering a judgment that exceeds the amount of no-fault benefits due. To avoid these improper results, we conclude that Nelson is entitled to receive $6,666.67 from American Family. Nelson's recovery of this amount represents American Family's proportionate share of the attorney fees charged in the South Dakota action. The following analysis demonstrates why the language and policy of the Act mandate this result.

If we adopt American Family's argument, we will be providing an incentive for similarly situated no-fault insurers to deny prompt payment of no-fault benefits in anticipation of the insured recovering a judgment against a tortfeasor. We conclude that such an incentive is contrary to the stated purposes of the No-Fault Act to provide prompt payment of benefits and speed the administration of justice. Minn. Stat. § 65B.42.

### 2. *Nelson's Position*

The position advocated by Nelson is equally untenable. Under Nelson's argument, she would begin with her net tort recovery of $24,666.67. She claims that she would then be entitled to recover from American Family the entire $12,333.33 paid in attorney fees because this amount represents income loss for which she remains uncompensated. Nelson argues that this amount is compensable under the No-Fault Act because the tort judgment represents her actual past income loss, while she was only *compensated* to the extent of her net tort recovery. Nelson's position is summarized as follows:

### 1. *American Family's Position*

American Family argues that Nelson is not entitled to no-fault benefits because any payment of no-fault benefits in addition to the $37,000 South Dakota judgment would constitute a double recovery that is against the policy of the No-Fault Act. However, the result advocated by American Family leaves Nelson worse off than she would have been if American Family had promptly paid no-fault benefits and then asserted a subrogation interest under Minn.Stat. § 65B.53. Further, it places American Family in a better position than it would have been had it paid Nelson no-fault benefits when she originally requested them. American Family would, in essence, receive the equivalent benefit of its full subrogation interest from the tort judgment without contributing anything for the attorney fees paid to obtain that judgment. American Family's position is summarized as follows:

| | |
|---|---|
| No–Fault Benefits Paid Before Tort Action | $ 0.00 |
| Nelson's Tort Judgment | $37,000.00 |
| Nelson's Attorney Fees | – $12,333.33 |
| | |
| Nelson's Net Tort Recovery | $24,666.67 |
| American Family's Payment Following Tort Action | $ 0.00 |
| Nelson's Combined Net Recovery | *$24,666.67* |

| | |
|---|---:|
| No–Fault Benefits Paid Before Tort Action | $ 0.00 |
| Nelson's Tort Judgment For Past Income Loss | $37,000.00 |
| Nelson's Attorney Fees | – $12,333.33 |
| Nelson's Net Tort Recovery | $24,666.67 |
| Nelson's "Uncompensated" Loss Due from American Family ($37,000–$24,666.67) | $12,333.33 |
| Nelson's Combined Net Recovery | *$37,000.00* |

Nelson relies primarily on *Ferguson v. Illinois Farmers Ins. Group Co.* to support her claim. 348 N.W.2d 730 (Minn. 1984). She argues that *Ferguson* and three subsequent court of appeals cases[2] support the use of the net amount of recovery to determine whether an insurer's payment of no-fault benefits results in a double recovery. Nelson asserts that *Ferguson* is relevant to this case because it addressed the interplay of (1) the Act's policy against double recoveries, (2) a tort judgment, and (3) attorney fees—a situation similar to that presented here. While we conclude that *Ferguson* is relevant to this issue, it does not provide the definitive guidance that Nelson asserts it does. The problems with Nelson's interpretation of *Ferguson* become apparent when the full consequences of her interpretation are explored.

In *Ferguson,* a plaintiff was involved in an automobile accident and subsequently sued the tortfeasor for damages; the plaintiff then sued the no-fault insurer when benefits were denied and the cases were consolidated for trial. 348 N.W.2d at 731. The jury eventually awarded $10,000 as damages for future medical expenses. *Id.* Applying the principle that duplicate recoveries are to be prevented, we held that the plaintiff was not entitled to receive benefits from her no-fault insurer for future medical expenses until she first exhausted her *net* tort recovery for future medical expenses. *Id.* at 733.

Having concluded in *Ferguson* that the plaintiff's net tort recovery must be exhausted before any no-fault benefits were payable, we then computed the net recovery by deducting the plaintiff's costs of collection, *including attorney fees. Id.* We explained that if additional medical expenses were incurred above the net tort recovery, the plaintiff would be entitled to payment for those medical expenses from the no-fault insurer up to the policy limits. *Id.* In effect, we allowed the net tort judgment to function as a bank that had to be exhausted before the no-fault insurer's future obligations took effect.

Nelson contends that *Ferguson* established a general principle that when assessing whether no-fault benefits would constitute a double recovery, any attorney fees paid in the tort action must be deducted from the tort judgment. However, when this general principle is applied to other provisions of the No–Fault Act, a confusing and contrary result is reached. More particularly, when the principle Nelson advocates is applied to compute the extent of a double recovery for purposes of calculating the no-fault insurer's subrogation claim, her net recovery is more than that allowed under Minn.Stat. § 65B.53.

**2.** Nelson cites three court of appeals cases applying *Ferguson* to different factual scenarios. *Simpson v. Am. Family Ins. Co.,* 603 N.W.2d 860, 863 (Minn.App.2000) (applying *Ferguson* analysis to a tort award for loss of future earning capacity); *State Farm Mut. Auto. Ins. Co. v. Spartz,* 588 N.W.2d 173, 176 (Minn.App.1999) (using *Ferguson* to note difference between no-fault and uninsured motorist claims); *LeBeau v. John Deere Ins. Co.,* 574 N.W.2d 83, 85–86 (Minn.App.1998) (applying *Ferguson* analysis to facts involving settlement before benefits paid).

C. *Subrogation Rights Under Section 65B.53*

To illustrate the problems with Nelson's argument, we first compare her proposal to what would have occurred had American Family not disputed the amount of any income loss and promptly paid the benefits due under its policy. It is possible to make this comparison because the No–Fault Act explicitly addresses this situation. For purposes of this comparison, the following facts remain the same: (1) Nelson is a Minnesota resident; (2) the second accident occurred in South Dakota; (3) Nelson brought a tort action in South Dakota; (4) the South Dakota jury awarded $37,000 for past income loss; and (5) Nelson paid her attorney a one-third contingency fee. Accordingly, the only difference would be that instead of denying no-fault benefits, American Family would have paid them before the South Dakota tort action was resolved.

If American Family, as Nelson's no-fault insurer, had paid no-fault benefits upon request up to the policy limits of $20,000, Nelson would have subsequently pursued the South Dakota tortfeasor on a negligence theory to recover any additional damages. With a jury award of $37,000 in past income loss, Nelson would have received a net recovery of $24,666.67 after having incurred $12,333.33 of attorney fees. But, under the Act, this recovery would be subject to American Family's subrogation interest. Minn.Stat. § 65B.53, subd. 2 (stating that the no-fault insurer

"is subrogated to the claim for the recovery of damages for economic loss that the [no-fault recipient] has against another person").

As previously noted, Minn.Stat. § 65B.53, subds. 2 and 8, allow a subrogation interest in the amount of benefits actually paid by the no-fault insurer. But the statute limits the subrogation interest to the extent that the insured's recovery, absent the subrogation interest, would produce a duplication of benefits or reimbursement of the same loss—i.e., a double recovery. Minn.Stat. § 65B.53, subd. 2. Accordingly, American Family would have a subrogation interest of $20,000.

However, under the statute, American Family's $20,000 subrogation interest is subject to its obligation to pay a proportionate share of Nelson's attorney fees. Minn.Stat. § 65B.53, subd. 8. This proportionate share is calculated by using the ratio of the subrogation claim ($20,000) to the judgment ($37,000), or 54.054%. *Id.* American Family would then be obligated to compensate Nelson for 54.054% of her attorney fees of $12,333.33, which is $6,666.67. Therefore, because of its obligation to pay a proportionate share of Nelson's attorney fees, American Family's subrogation claim would be reduced from $20,000 to a net subrogation claim of $13,333.33. This would leave Nelson with a combined net recovery of $31,333.33. The results of the subrogation statutory scheme applied to this scenario are summarized as follows:

| | | |
|---|---|---|
| No–Fault Benefits Paid Before Tort Action | | $20,000.00 |
| Nelson's Tort Judgment For Past Income Loss | $37,000.00 | |
| Less Nelson's Attorney Fees | − $12,333.33 | |
| American Family's Subrogation Claim | − $20,000.00 | |
| Net amount after subrogation | $ 4,666.67 | |
| American Family's Proportionate Share of Nelson's Attorney Fees | + $ 6,666.67 | |
| Nelson's Net Tort Recovery | $11,333.34 | $11,333.34 |
| Nelson's Combined Net Recovery | | *$31,333.34* |

| | |
|---|---|
| American Family's Net Expenditure | $ 6,666.67 |
| American Family's Net Subrogation Recovery | $13,333.33 |

When the foregoing analysis is done, it becomes obvious that there is an inconsistency between Nelson's argument that *Ferguson* mandates that she recover $37,000 and the $31,333.34 Nelson would have been entitled to had American Family paid no-fault benefits before the tort action was resolved. While it may appear that the statute and the holding in *Ferguson* are inconsistent when applied to the facts in this case, this is not necessarily so. The purposes behind both are the same and can be reconciled by examining them in the context of (1) the purpose of the no-fault insurer's obligation to pay a part of the attorney fees when an accident occurs in another state under Minn.Stat. § 65B.53, subd. 8, and (2) the specific facts in *Ferguson*. Both assure that the no-fault insurer pays its fair share of any costs incurred in receiving any benefit from the insured's tort judgment.

In other words, both the no-fault insurer's obligation to pay a share of the attorney fees and the net recovery analysis under *Ferguson* demonstrate the price a no-fault insurer pays to offset the benefit it receives when the insured brings a successful tort action against a tortfeasor. *See* 2 Michael K. Steenson, *Minnesota No-Fault Automobile Insurance* 268 (2d ed.1989). In the out-of-state subrogation context, the no-fault insurer pays a share of the insured's attorney fees because the insured bore the costs of recovery for the entire judgment, including the part that ultimately belongs to the no-fault insurer through subrogation. If the no-fault insurer did not have to pay a share of the fees, it would essentially be receiving a windfall because it paid no part of the *insured's* cost to recover the *no-fault insurer's* subrogation interest.

Although less obvious, the rationale behind the costs and attorney fee-sharing in the subrogation context was also behind our decision in *Ferguson*. In *Ferguson*, we held that the net tort recovery must first be exhausted before collecting further no-fault benefits for future medical expenses from the no-fault insurer. 348 N.W.2d at 733. Requiring the insured first to exhaust the net tort recovery is a benefit to the no-fault insurer because, rather than paying first-dollar coverage for future medical expenses, the no-fault insurer incurs no obligation unless and until those expenses exceed the net tort recovery. However, we were not specific in *Ferguson* when we discussed *how* the net recovery, and hence the no-fault insurer's benefit, would be calculated other than specifying that the costs of collection, including reasonable attorney fees, were to be deducted. *Id.*

While we were not specific in calculating the net tort recovery, given the similarity in purpose between the subrogation fee-sharing provision and the benefit in *Ferguson*, it is logical to calculate the net recovery in a *Ferguson* scenario by using a similar calculation and including the no-fault insurer's share of the attorney fees. *See* Steenson at 268. In effect, the calculation in *Ferguson* takes into consideration the insurer's share of the insured's attorney fees.

After having worked through the foregoing comparisons, we conclude that when analyzed in the proper context, *Ferguson* does not, as Nelson argues, stand for the proposition that an insured is uncompensated to the full extent of her attorney fees paid in achieving a tort recovery. Instead, *Ferguson's* use of the net tort recovery as a bank, which must be offset by the no-

fault insurer's share of the fees, has more to do with ensuring that the no-fault insurer does not receive an unintended benefit than in making a broad statement about how an uncompensated loss or a double recovery should be calculated.

More importantly, application of Nelson's interpretation of *Ferguson* to either the facts of this case or to the analysis in the customary case scenario is problematic. Under Nelson's application of *Ferguson* to the facts of this case, she asserts that she is entitled to receive $12,333.33 from American Family. In essence, Nelson would have American Family assume responsibility for attorney fees for both (1) that part of her recovery that would have been paid as no-fault benefits, and (2) that part of her recovery that is in addition to what she would have received under the Act. As shown above, while the Act does make provision for some fee-sharing to ensure that the no-fault insurer does not receive a windfall, it does not contemplate reimbursing the insured for all of her attorney fees.

### D. *Nelson is Entitled to Receive No-Fault Benefits from American Family*

As previously noted, neither American Family's nor Nelson's position fully acknowledges the No–Fault Act's scheme for coordination and reconciliation of benefits and tort recoveries, or achieves the full purposes of the Act. Neither position reconciles the tension between two policies of the Act—prevention of double recoveries and ensuring prompt payment of benefits. *See* Minn.Stat. § 65B.42.

There is a resolution that accommodates both of these policies—allowing Nelson a recovery that mirrors what she would have

received if American Family had initially paid the no-fault benefits. Nelson would then have had a net recovery of $31,333.34, comprising her original $20,000 of no-fault benefits and her post-subrogation and post-attorney fee net tort judgment of $11,333.34. American Family's net payment to Nelson would have been $6,666.67 after recovering its subrogation interest, which amounts to its proportionate share of Nelson's attorney fees.

Because American Family has not paid no-fault benefits to Nelson, in economic terms it is in the same position as it would have been if it collected a $20,000 subrogation interest in Nelson's tort recovery. Having received an equivalent financial benefit from Nelson's tort action, American Family should pay an equivalent price—that is, its proportional share of Nelson's attorney fees. Nelson paid a one-third contingency fee to recover the tort judgment and American Family benefited from $20,000 of that judgment. Therefore, American Family must reimburse Nelson for the attorney fees incurred to achieve that benefit, one-third of $20,000. Accordingly, we conclude that American Family is obligated to pay Nelson $6,666.67, representing its proportional share of the $12,333.33 attorney fees paid by Nelson. When this $6,667.67 award is added to Nelson's net tort recovery of $24,666.67, her total recovery of $31,333.34 and American Family's expenditure of $6,667.67 will put both parties in the same financial position as in section 65B.53 subrogation.[3]

Under the foregoing interpretation of the Act, Nelson's recovery is exactly what the Act would have required if American Family had promptly paid the no-fault

---

**3.** We note that under the result we reach, American Family will be required to pay statutory interest on the $6,666.67 under Minn. Stat. § 65B.54, subd. 2, but the Act appears to have contemplated this result as an incentive to promote prompt payment.

benefits. American Family is ultimately no worse off than if it had paid the benefits promptly, except for the interest it must pay as a penalty. The reasonableness of this outcome is especially apparent when compared to the outcome of American Family's argument to leave the status quo in place, which would allow Nelson no further recovery and would have American Family pay nothing—$6,666.67 less than if it had paid the benefits promptly. Essentially, American Family is asking to receive a windfall. We have stated that, "as between an insurer and [an] insured, if there is to be a windfall, it should be to the insured." *Wallace v. Tri–State Ins. Co. of Minn.,* 302 N.W.2d 337, 340 (Minn.1980). In addition, adopting American Family's position would frustrate the Act's purpose to ensure prompt payment of no-fault benefits because it would encourage insurers to delay payment of no-fault benefits in the hope that the insured would recover up to the policy limits from a third-party tortfeasor.[4]

### E. *Conclusion*

Based on the foregoing analysis, we conclude that Nelson is entitled to receive $6,666.67 from American Family in no-fault benefits. This amount represents the attorney fees Nelson incurred to recover an amount that she should have received from American Family upon demand. Any greater recovery is not contemplated by the Act because the Act contemplates that an insured is responsible for any attorney fees incurred to recover amounts above the no-fault policy limit. Although Nelson recovered $37,000 from the tortfeasor, she was entitled to receive $20,000 of that recovery as no-fault benefits under her policy with American Family and she should not have to bear the burden of that part of the attorney fees. Nevertheless, Nelson actually recovered $17,000 more than this $20,000 and she is responsible for the fees expended in the recovery of the amount greater than her no-fault entitlement. Therefore, we conclude that when a no-fault insurer has denied no-fault benefits for an out-of-state accident and the insured subsequently recovers in the other state a tort judgment that includes damages covered by basic economic benefits under the No–Fault Act, the insured is entitled to recover from the no-fault insurer an amount equal to that portion of the insured's attorney fees incurred in obtaining the tort judgment that is proportional to the benefit to the no-fault insurer of having the basic economic benefits paid by the tort judgment. Accordingly, we hold that the district court erred when it dismissed Nelson's complaint.

---

4. We also note that the rationale behind our conclusion that Nelson should have been awarded an additional $6,666.67 is bolstered when this result is compared to what would have happened if the second accident had occurred in Minnesota and American Family had paid $20,000 in no-fault benefits up front. When an accident occurs in Minnesota, the Act provides for an offset instead of a subrogation interest to reduce Nelson's tort recovery. Minn.Stat. § 65B.51, subd. 1. Unlike a subrogation interest, this offset does not inure to the benefit of American Family; instead, it reduces Nelson's recovery. *Id.*

If American Family had paid $20,000 of no-fault benefits up front, this amount would be deducted from Nelson's $37,000 in damages under Minn.Stat. § 65B.51, subd. 1. Nelson would then be left with a $17,000 tort judgment, out of which she would pay her one-third contingency fee of $5,666.67, leaving her with a net tort recovery of $11,333.33. When combined with the $20,000 of no-fault benefits she initially received, Nelson would have a combined net recovery of $31,333.33— the same total recovery we have held that she is entitled to receive. The difference between the two recoveries is that, in Minnesota, American Family would have paid the entire $20,000 and had no recovery through subrogation.

## II.

American Family also raised three other defenses to Nelson's claim—collateral estoppel (issue preclusion), res judicata (claim preclusion), and accord and satisfaction. We shall address each of these defenses in turn.

### A. *Collateral Estoppel*

■ The doctrine of collateral estoppel is employed to prevent "parties to an action from relitigating in subsequent actions issues that were determined in the prior action." *In Re Special Assessment for Water Main Extension in the Vill. of Byron*, 255 N.W.2d 226, 228 (Minn.1977). Collateral estoppel applies when "(1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue." *Willems v. Comm'r of Pub. Safety*, 333 N.W.2d 619, 621 (Minn.1983) (citation omitted). Courts do not apply collateral estoppel rigidly and focus instead on whether an injustice would be worked upon the party upon whom the estoppel is urged. *Johnson v. Consol. Freightways, Inc.*, 420 N.W.2d 608, 613–14 (Minn.1988).

■ American Family asserts that the issues resolved in the South Dakota action are identical to the issues raised in this litigation because the issue of income loss was identical. Nelson argues that the main issue here is different even though she would be prevented from relitigating the amount of income loss. More specifically, Nelson argues that the issue presented here is whether American Family was obligated to pay no-fault benefits under Nelson's insurance policy—an issue not addressed in the prior litigation.

Although similarities do exist on a superficial level, the actual legal issues raised in the two cases are not identical. The litigation in South Dakota was a tort action for personal injuries while the instant action is a breach of contract claim for payment of no-fault insurance benefits. The damages in the tort action and the amount of benefits at issue in this case are identical, but the actual legal issue decided in South Dakota was whether the defendant in that action was negligent; the legal issue here is whether American Family is required to pay no-fault benefits. Therefore, we conclude that Nelson is not collaterally estopped from asserting her claim because the issues in the South Dakota litigation were not the same as the issues presented here.

### B. *Res Judicata*

■ The doctrine of res judicata (claim preclusion) bars a claim when litigation on a prior claim involved the same cause of action, there was a judgment on the merits, and the claim involved the same parties or their privies. *Veline v. Dahlquist*, 64 Minn. 119, 121, 66 N.W. 141, 142 (1896) (citations omitted), *cited with approval in Beutz v. A.O. Harvestore Prods., Inc.*, 431 N.W.2d 528, 531 (Minn. 1988), and *Youngstown Mines Corp. v. Prout*, 266 Minn. 450, 466, 124 N.W.2d 328, 340 (1963). In addition, the party against whom res judicata is applied must have had a full and fair opportunity to litigate the matter in the prior proceeding. *See Dorso Trailer Sales, Inc. v. Am. Body and Trailer, Inc.*, 482 N.W.2d 771, 774 (Minn. 1992). If those requirements are met, res judicata bars not only claims as to matters actually litigated, but also as to every matter that might have been litigated in the prior proceeding. *Care Inst., Inc.—Roseville v. County of Ramsey*, 612 N.W.2d 443, 447 (Minn.2000); *Veline*, 64 Minn. at 121, 66 N.W. at 142 (citations omitted),

*cited with approval in Beutz,* 431 N.W.2d at 531, and *Youngstown Mines Corp.,* 266 Minn. at 466, 124 N.W.2d at 340.

■ Nelson's South Dakota cause of action was a personal injury tort action brought to recover damages arising out of personal injuries and the negligence of the defendant. Nelson's cause of action in this case is for breach of contract to recover mandatory no-fault insurance benefits under an insurance policy. Accordingly, we conclude that Nelson is not barred by res judicata from asserting her cause of action because the cause of action in the prior litigation is not identical to the cause of action in this litigation.

### C. *Accord and Satisfaction*

■ We have stated that accord is "a contract in which a debtor offers a sum of money, or some other stated performance, in exchange for which a creditor promises to accept the performance in lieu of the original debt." *Webb Bus. Promotions, Inc. v. Am. Elecs. & Entm't Corp.,* 617 N.W.2d 67, 72 (Minn.2000). "[S]atisfaction is the performance of the accord, generally the acceptance of money, which operates to discharge the debtor's duty as agreed to in the accord." *Id.* at 72–73 (citations omitted).

> The purpose of accord and satisfaction is to allow parties to resolve disputes without judicial intervention by discharging all rights and duties under a contract in exchange for a stated performance, usually a payment of a sum of money.
> An enforceable accord and satisfaction arises when a party against whom a claim of breach of contract is asserted proves that (1) the party, in good faith, tendered an instrument to the claimant as full satisfaction of the claim; (2) the instrument or an accompanying written

communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim; (3) the amount of the claim was unliquidated or subject to a bona fide dispute; and (4) the claimant obtained payment of the instrument.

*Id.* at 73 (citations omitted.).

■ To successfully raise the defense of accord and satisfaction, American Family must prove that it, in good faith, intended its satisfaction of judgment on the tort claim[5] to be full satisfaction of Nelson's pending no-fault claim. Additionally, American Family must prove that the instrument with which it paid the judgment contained a statement to the effect that it was tendered in full satisfaction of Nelson's no-fault claim.

■ There is nothing in the record other than the official "Satisfaction of Judgment" signed by Nelson's attorney with respect to the South Dakota judgment. This document contains no indication that it, or the actual instrument of payment, was to be in satisfaction of anything more than Nelson's tort claim against the tortfeasor. Accord and satisfaction is an affirmative defense, and therefore its elements must be proved by American Family. We conclude that Nelson's claim is not barred by accord and satisfaction because American Family cannot prove the first or second elements of the defense on the record before this court.

As a matter of law, we hold that American Family's defenses of collateral estoppel, res judicata, and accord and satisfaction do not bar Nelson's recovery.

We reverse the court of appeals and remand to the district court for further

---

**5.** American Family was also the insurer for   the defendant in the South Dakota litigation.

proceedings in accordance with this opinion.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.