# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 04-3386/3855

_____

Conwed Corporation,            *
                               *
    Cross-Appellee/Appellant,  *
                               *   Appeals from the United States
    v.                         *   District Court for the
                               *   District of Minnesota.
Union Carbide Corporation,     *
                               *
    Cross-Appellant/Appellee.  *

_____

Submitted: September 15, 2005
Filed: April 18, 2006

_____

Before RILEY, HEANEY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Conwed Corporation appeals the district court's application of comparative fault to reduce Conwed's jury-awarded damages in its subrogation action to recover workers' compensation benefits paid and payable to its employees. Union Carbide cross-appeals, claiming that the action was collaterally estopped, and that the court incorrectly included certain damages and erroneously dismissed its counterclaim for equitable contribution. We affirm in all but one respect.

I.

Conwed used asbestos purchased from Union Carbide to manufacture ceiling tiles. Employees of Conwed, a self-insured employer, contracted asbestos-related diseases, and Conwed paid them workers' compensation benefits. The employees also sued Union Carbide in tort based on a theory of product liability, and all of the employees entered into settlements with Union Carbide for damages not compensated through Minnesota's statute governing workers' compensation. Conwed then sued Union Carbide in subrogation, seeking recovery for the workers' compensation benefits that were paid and payable (*i.e.*, "benefits paid"). Union Carbide counterclaimed for contribution and indemnity. The district court certified five questions to the Supreme Court of Minnesota, and after receiving guidance on certain matters of state law, *Conwed Corp. v. Union Carbide Chemicals & Plastics, Co.*, 634 N.W.2d 401 (Minn. 2001), the district court proceeded to try the claims.

The court divided the claims into three disease groups and then tried the first group, consisting of mesothelioma claims. The first trial resulted in a jury verdict for Union Carbide. Conwed agreed to a dismissal of claims for the employees in the second disease group (lung cancer), and the parties then tried the consolidated claims of eleven employees with a third disease, asbestosis, in a bifurcated trial. The jury found both Conwed and Union Carbide at fault for causing injuries to six of those employees, and awarded common law damages, including general disability and loss of future earning capacity.

In accordance with *Tyroll v. Private Label Chemicals, Inc.*, 505 N.W.2d 54 (Minn. 1993), a special master determined the amount of benefits paid and payable by Conwed to the employees. The district court reviewed and partially adopted the special master's findings, and determined the amount of subrogation damages to which Conwed was entitled: the lesser of (1) the amount of benefits actually paid and payable through workers' compensation; or (2) the percentage of the jury's award of

damages attributable to Union Carbide's fault. For five of the six employees, the amount of workers' compensation benefits paid and payable was less than the tort damages attributable to Union Carbide, so the court reduced the amount of benefits paid by the percentage of fault attributable to Conwed. For the sixth employee, the tort damages attributable to Union Carbide were less than the benefits paid, so the court reduced the tort damages attributable to Union Carbide by Conwed's percentage of fault. The remaining 118 asbestosis claims were stayed pending the appeal.

Conwed appeals, claiming that the district court improperly applied the jury's common law allocation of fault to the benefits paid and payable to determine Conwed's subrogation award. Conwed argues that the court instead should have applied the allocation of fault only to the common law damages determined by the jury, and then awarded as subrogation damages the lesser of (1) the resulting common law damages amount or (2) the amount of the workers' compensation benefits paid and payable. Union Carbide cross-appeals, arguing that the second jury trial was barred by collateral estoppel, because the issue of whether Union Carbide's warnings regarding its asbestos were adequate already had been conclusively established in the first trial concerning mesothelioma. Alternatively, if the action was not barred, Union Carbide claims the district court improperly allowed the jury to award disability damages, damages for loss of future earning capacity, and damages for the predicted progression of existing conditions. The district court denied Union Carbide's claim against Conwed for equitable contribution to offset the jury's award of subrogation damages, and Union Carbide appeals that decision as well.

II.

We address first whether the doctrine of collateral estoppel barred the second jury trial. In the first trial concerning mesothelioma, the district court provided the jury with a special verdict form. The first question asked, "Was the Calidria asbestos Union Carbide sold to Conwed in a defective condition unreasonably dangerous to the

-3-

users of that asbestos because Union Carbide failed to provide adequate warnings and instructions for the safe use of that asbestos?" If the jury answered in the affirmative, the verdict form then asked whether the defective condition of Union Carbide's asbestos was a direct cause of mesothelioma in each of the six employees, whether Conwed was negligent with respect to the safety of the workers, and what amount of money would compensate the employees. The jury instructions accompanying the first question directed the jury as follows:

> In deciding whether the manufacturer's warnings and instructions were reasonably adequate, consider all the facts and circumstances, including, among others: 1) The likelihood that harm would result from use of the product; 2) The seriousness of the harm that would result; 3) The cost and ease of providing warnings and instructions that would avoid the harm.

Instructions to the Jury (R. Doc. 749, at 9). The jury answered "no" to the first question on the verdict form, and, in accordance with the instructions, did not answer the remaining questions.

Union Carbide argues that the jury's negative answer to this first question precludes Conwed from challenging the adequacy of Union Carbide's warnings in the second jury trial concerning employees affected with asbestosis. The district court held that despite the broad language of the first question, because the employee claims were grouped by disease and the jury was instructed to consider all the facts and circumstances, the jury reasonably could have assumed that the "harm" described in the jury instructions was limited to mesothelioma. The district court noted that Conwed did not present all of its evidence with respect to claims involving lung cancer or asbestosis, and held that Union Carbide had not met its burden of showing that the issue of the adequacy of Union Carbide's warnings with respect to mesothelioma plaintiffs was identical to the issues to be determined in the remaining claims by employees afflicted with different diseases. The court further held that that

Conwed did not have a fair opportunity to litigate the adequacy of the warnings with respect to the claims of employees not before the first jury. We agree with the district court that Conwed is not collaterally estopped from litigating the adequacy of Union Carbide's warnings with respect to asbestosis, because this issue was not necessarily determined in the first trial.

A federal court with jurisdiction by virtue of diversity of citizenship applies state law to questions of issue preclusion. *Canal Capital Corp. v. Valley Pride Pack, Inc.*, 169 F.3d 508, 513 (8th Cir. 1999). Issue preclusion is a mixed question of law and fact, and the district court's decision on that matter is subject to *de novo* review. *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 757 (8th Cir. 2003). Minnesota applies the doctrine of collateral estoppel to prevent parties from relitigating issues that are "both identical to those issues already litigated by the parties in a prior action and necessary and essential to the resulting judgment." *Pope County Bd. of Comm'rs v. Pryzmus*, 682 N.W.2d 666, 669 (Minn. Ct. App. 2004) (internal quotation omitted). Collateral estoppel applies if all four of the following elements are present:

> 1) the issue was identical to one in a prior adjudication; 2) there was a final judgment on the merits; 3) the estopped party was a party or in privity with a party to the prior adjudication; and 4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Willems v. Comm'r of Pub. Safety*, 333 N.W.2d 619, 621 (Minn. 1983).

Issue identity "requires the party asserting it to establish that the precise question was in fact presented and necessarily determined by the verdict in the former trial." *Brooks Realty, Inc. v. Aetna Ins. Co.*, 128 N.W.2d 151, 153 (Minn. 1964). A determination of the identical issue must be "necessarily implied" in the verdict of the earlier action. *Gollner v. Cram*, 102 N.W.2d 521, 523 (Minn. 1960). Minnesota

courts do not apply collateral estoppel rigidly, but instead focus on "whether an injustice will be worked upon the party upon whom estoppel is urged." *Nelson v. Am. Family Ins. Group*, 651 N.W.2d 499, 511 (Minn. 2002). Union Carbide claims that because the jury's special verdict form separated the question of the adequacy of the warnings from the question of whether Union Carbide's asbestos caused mesothelioma, the jury's negative answer to the first question necessarily implies that it found the warnings adequate with respect to all potential hazards.

As noted, the district court divided the cases into three trial groups based on the type of injury claimed (mesothelioma, asbestosis, or lung cancer). Conwed was required to assert and prove separate claims for each of its former employees, and the divided trial structure limited the evidence presented in the first trial largely to the disease of mesothelioma.

The arguments of counsel likewise focused on mesothelioma, and suggested that whether the asbestos caused mesothelioma was part of the analysis in determining whether the warnings were adequate. In closing argument, Union Carbide argued that it was "not fair" to criticize its product warnings for failing to warn that the asbestos may cause mesothelioma, because "there wasn't any scientific basis" for saying that "Calidria could cause mesothelioma." (Closing Arg. Tr. at 26). Conwed similarly urged the jury to consider "the likelihood that harm would result from use of the product" when evaluating the adequacy of the warnings, and equated "harm" with mesothelioma: "Once you have got mesothelioma it is incurable, you're going to die. This harm is as bad as it can be." (Closing Arg. Tr. at 85).

Union Carbide argues that under the jury instructions in the first trial, the question whether asbestos was likely to cause mesothelioma was relevant only if the jury first found that the product warnings were inadequate. We are not persuaded, however, that the questions of adequate warnings and causation were wholly independent. The jury instructions contained ambiguities. By incorporating the

-6-

likelihood that harm would result from the use of asbestos into the question whether warnings were adequate, the broadly worded instruction on warnings permitted a reasonable jury to conclude that warnings were adequate because the asbestos was not likely to cause the "harm" that was the subject of the first trial – mesothelioma. Both parties addressed the adequacy of warnings by debating whether the warnings were sufficient to inform users of the dangers of contracting mesothelioma. Thus, viewing the jury instructions as a whole in the context of the trial, we conclude that the first jury's verdict did not "necessarily imply" that Union Carbide's warnings were adequate for all purposes, including to warn against the possible harm of asbestosis. Therefore, the doctrine of collateral estoppel did not bar the second trial.

## III.

The remaining issues relate to whether the district court correctly determined workers' compensation subrogation damages under Minnesota law. We review questions of state law *de novo*. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991).

## A.

Conwed argues that the district court misapplied the jury's allocation of fault and incorrectly calculated its subrogation award. In Minnesota, workers' compensation claims are regulated by statute. If an employee elects to receive benefits from his or her employer, the employer has a right of indemnity against any third-party tortfeasor whose action many have contributed to the employee's injury. Minn. Stat. § 176.061, subd. 3 (1992). Any recovery against the third party is divided according to a three-step procedure. After collection costs are deducted, one third of the remainder belongs to the injured employee without any right of subrogation by the employer. Out of the remaining balance, the employer is reimbursed the amount of workers' compensation benefits paid, less a proportionate share of the collection costs.

Any amount remaining is paid to the employee and is a credit against any benefits the employer is obligated to pay in the future. Minn. Stat. § 176.061, subd. 6.

If the employer is apportioned any fault, the liable third-party tortfeasor may assert a right of contribution against the employer in an amount proportional to the employer's fault, but not to exceed the amount of benefits paid and payable by the employer. *Lambertson v. Cincinnati Corp.*, 257 N.W.2d 679, 689 (Minn. 1977). This contribution claim is essentially an equitable set-off against the employer's recovery of workers' compensation benefits paid from the third-party tortfeasor.

Instead of proceeding with a trial, the employee also may choose to settle with the third-party tortfeasor for all claims outside of the workers' compensation scheme (and thus not subject to the employer's subrogation claim). In Minnesota, such a settlement is known as a "*Naig* settlement," based on the decision in *Naig v. Bloomington Sanitation*, 258 N.W.2d 891 (Minn. 1977), which described the process. After a *Naig* settlement, the employer may still assert a subrogation claim to recover workers' compensation benefits paid and payable from the third-party tortfeasor, but the employee gives up his or her statutory right to one-third of any recovery. *Id.* at 894. The employer also has no liability to contribute to the settlement agreement between the employee and the third-party tortfeasor. *Kempa v. E.W. Coons Co.*, 370 N.W.2d 414, 418 (Minn. 1985).

Once an employee has entered into a *Naig* settlement with the third-party tortfeasor, the employer steps into the shoes of the employee and asserts a subrogation claim in tort against the third party to recover benefits paid. This subrogation recovery is not subject to the statutory formula, and is limited to the type of compensatory damages awarded under workers' compensation. *Tyroll*, 505 N.W.2d at 60-61. The district court holds a hearing to determine the amount of benefits paid and payable, and any tort damages the employer recovers in the subrogation action apply to this amount. If the tort damages exceed the amount of workers'

compensation benefits paid and payable, then the employer's maximum recovery is limited to the benefits paid and payable. If the tort damages are less, the employer may only recover the amount of the jury verdict. *Id.*

Minnesota courts, however, have not indicated how the jury's allocation of fault to the employer applies to this determination of subrogation damages following a *Naig* settlement. The Supreme Court of Minnesota in *Tyroll* stated that "[u]nder this method, comparative fault (when an issue) may diminish or defeat liability for the subrogation claim." 505 N.W.2d at 61. But because the jury in *Tyroll* did not find the employer negligent, the court had no occasion to indicate precisely how the employer's fault would diminish the subrogation damages. *Id.* at 56.

Union Carbide entered into a *Naig* settlement with the employees. Conwed then proceeded against Union Carbide to recover subrogation damages, and the court appointed a special master to determine the amount of benefits paid. In the second phase of the bifurcated asbestosis trial, however, the jury found both Conwed and Union Carbide liable for causing injuries to six employees, and apportioned fault to both companies. Conwed's fault ranged from 70 to 91 percent, while Union Carbide's fault ranged from 9 to 30 percent. None of the six employees was found to be at fault. The district court held that the allocation of fault should apply to the lesser of the benefits paid or the percentage of common law tort damages attributable to Union Carbide. It adopted a two-step procedure, under which the court first determined the employer's subrogation damages (the lesser of the benefits paid and payable as determined in the hearing or the percentage of the jury's award attributable to Union Carbide's fault). The court then reduced the total subrogation damages proportionately by the percentage of fault attributable to Conwed and entered judgment against Union Carbide in this amount.

Conwed disagrees with this method. It contends that the jury's allocation of fault should reduce the jury's award of damages first, and then the lesser of this

reduced verdict or the benefits paid should be the amount of the judgment. Conwed urges that under *Kempa* and *Tyroll*, the employer's subrogation damages must be "recovered out of the common law tort damages for which the third party tortfeasor is first found responsible." *Tyroll*, 505 N.W.2d at 60. Because the jury's allocation of fault is part of the common law jury verdict, Conwed argues, it should be applied to the verdict first. This reduced verdict, in Conwed's model, may be recovered up to the cap of benefits paid.

Union Carbide relies on a competing principle in Minnesota law, namely, that third-party tortfeasors should not be forced to bear the costs of negligent employers. It is a "basic proposition" in Minnesota decisions that all parties must pay according to their share of fault, *Todalen v. United States Chemical Co.*, 424 N.W.2d 73, 82 (Minn. Ct. App. 1988), and tortfeasors are liable for damages "commensurate with their own relative culpability." *Kempa*, 370 N.W.2d at 421. *Lambertson* equitable contribution claims are recognized to prevent "a third-party stranger to the workers' compensation system" from bearing the burden of a full common-law tort judgment, and to preclude employers from recovering all workers' compensation benefits paid in a subrogation action, where the employer was at greater fault than the tortfeasor. *Lambertson*, 257 N.W.2d at 684. Equitable contribution allows the employer to recover only those portions of the subrogation damages attributable to the tortfeasor's negligence. Against this backdrop, Union Carbide argues that it should have to bear the percentage of the benefits paid attributable to its relative fault, but Conwed should have to bear the percentage attributable to its fault. Thus, the reduction due to Conwed's fault should apply to the lesser of the jury verdict or the benefits paid.

While Minnesota law is unsettled in this area, we believe that the Supreme Court of Minnesota is more likely to agree with Union Carbide. Here, the jury found that the employer bore a percentage of fault for the injuries to its employees. Minnesota law consistently emphasizes that parties should bear the portion of damages attributable to their percentage of fault, and *Tyroll* is not inconsistent with

-10-

this principle. Therefore, we do not believe the Minnesota courts are likely to endorse the view that Conwed may recover 100% of the benefits paid and payable, despite its contribution to the injuries. We agree with the district court that the jury's allocation of fault should apply to the lesser of the benefits paid or the jury verdict. We note, however, that the reduction should only be applied once, to the lesser of the full value of the verdict or the benefits paid. The district court's initial reduction of the pre-comparison damages by Union Carbide's percentage of fault was error.[1]

Union Carbide also claims an additional *Lambertson* contribution claim to set off against the subrogation damages and to reduce further Conwed's recovery, even after the reduction by the jury's allocation of fault. Comparative fault, however, is the basis for the modified apportionment of damages that was developed in *Lambertson* and applied as an equitable contribution claim. *Kempa*, 370 N.W.2d at 421. *Lambertson* applies where a jury verdict must be apportioned between compensable damages recoverable under workers' compensation and those not recoverable, not where noncompensatory damages have been settled and the trial is only to recover workers' compensation benefits paid. The Supreme Court of Minnesota refers to this distinction when it notes that where only a subrogation claim is tried to the jury, "there is no *Lambertson* contribution problem because the employer, even if at fault, is not liable to contribute to the sum the tortfeasor paid the employee to settle the 'nonrecoverable' damages under the *Naig* release." *Tyroll*, 505 N.W.2d at 61. The

---

[1]For five of the six employees, the district court's initial reduction of the jury verdict had no effect, because this value was still greater than the amount of benefits paid. For one employee, Frederick Riedel, the amount of the tort damages reduced by Union Carbide's fault was less than the amount of benefits paid, so the court incorrectly reduced again the tort damages already reduced by Conwed's fault. The court should have reduced the amount of benefits paid ($69,426.74) rather than the reduced tort damages ($65,982.62) by Conwed's fault (88%). (Appellant's App. at 49-50). The correct award of subrogation damages for this employee is $8,331.21, rather than $7,917.91, a difference of $413.30, and the total award should be $23,878.36 instead of $23,465.06.

only damages at issue in this appeal are the subrogation damages, and the application of comparative fault provides the proper allocation of damages without resort to an additional equitable contribution.

B.

Union Carbide argues that the district court incorrectly allowed Conwed to obtain common law general disability damages in a subrogation action when it permitted Conwed to recover permanent disability benefits paid to six workers. It contends that permanent disability benefits are a type of general disability damages, and that general disability damages are not recoverable under workers' compensation, so they should not be recoverable in a subrogation action. Union Carbide contends that any claim the employees had for non-compensable damages was settled by the *Naig* settlement, so Conwed should not be permitted to recover permanent disability benefits.

The district court held that Conwed could recover in a subrogation action damages for permanent disability benefits paid to its employees under workers' compensation. The jury found that six workers suffered from asbestos-related disease causing lung impairment. Conwed had paid permanent partial disability to five of these workers, and permanent total disability to one, so the court permitted Conwed to seek recovery of these benefits paid. The court noted that although the language in *Tyroll* seemed to indicate a line of demarcation between the categories of damages recoverable and those not recoverable, Minnesota courts traditionally have enjoyed the flexibility to allocate damage awards, and Conwed was not precluded as a matter of law from recovering benefits paid for permanent disability.

We agree with the district court. It is true, as Union Carbide notes, that *Tyroll* provides guidance concerning the types of damages "ordinarily" recoverable under workers' compensation:

-12-

[C]ommon law tort damages for past and future wage loss and loss of earning capacity are the kind of damages that should be deemed recoverable under workers' compensation. Common law damages of the kind not recoverable under workers' compensation should, we think, be deemed to include pain and suffering, general disability, embarrassment, disfigurement, and mental anguish. We believe this division for allocation purposes should govern, at least ordinarily.

*Tyroll*, 505 N.W.2d at 59.

This division, however, is premised on the principle that employers should be able to sue for the type of common law tort damages recoverable under workers' compensation. The Minnesota Workers' Compensation Act states that in a subrogation action, an employer may recover "the aggregate amount of benefits payable to or on behalf of the employee," Minn. Stat. § 176.061, subd. 3, and, in Minnesota, employers are required to pay workers' compensation benefits for permanent partial and total disability. *See* Minn. Stat. § 176.021, subd. 3; Minn. Stat. § 176.101, subd. 4.

As the district court points out, Minnesota courts also have been empowered to allocate damages between those compensable under workers' compensation and those not compensable, *see, e.g.*, *Kempa*, 370 N.W.2d at 417, and, prior to *Tyroll*, the Minnesota Supreme Court allowed an employer to recover disability benefits, as well as medical expenses, in a workers' compensation subrogation action. *Dockendorf v. Lakie*, 61 N.W.2d 752, 756 (Minn. 1953); *Kempa*, 370 N.W.2d at 417 n.1, 420 n.3 (including payments for permanent partial and total disability in the damages subject to the employer's subrogation interest). While *Tyroll* correctly notes that damages for injuries such as embarrassment and mental anguish are not recoverable under workers' compensation, payments for permanent disability benefits are authorized by statute. They are not "general disability" payments akin to damages for pain and suffering or mental anguish. The "aggregate amount of benefits paid" includes payments for

-13-

permanent disability, and the district court thus determined correctly that Conwed is not precluded from recovering permanent disability benefits in its subrogation action.

## C.

The jury also awarded damages for loss of future earning capacity for two employees. Union Carbide contends that because Conwed offered no evidence of the employees' current medical condition, work status, or earnings, and because the district court dismissed Conwed's claim for past lost wages for lack of proof, the claim for loss of future earning capacity should have been dismissed as well. The district court concluded that a stipulation of the parties and medical records in evidence provided a sufficient basis for the jury's award.

A reviewing court must consider the evidence in the light most favorable to the verdict and may set aside a jury verdict only where no reasonable jury could have arrived at the result based on the evidence. *Majerus v. Guelsow*, 113 N.W.2d 450, 454 (Minn. 1962). The district court held that, while recent evidence of Conwed's employees' wages and work history may have been helpful, proof of that sort was not required for the jury to determine a loss of future earning capacity. An employee needed to show only that he suffered a permanent impairment of function resulting from the injury, and that the impairment prevented him from performing his duties in the same manner as before the injury. The court thought the jury permissibly could infer the employees' ages, employment history, and symptoms from the medical records produced at trial.

We agree with the district court. Loss of future earning capacity does not require specific proof of actual earnings either before or after the injury, *Wilson v. Sorge*, 97 N.W.2d 477, 482-83 (Minn. 1959), and, for example, the Supreme Court of Minnesota has allowed recovery for a plaintiff "who was presently performing

homemaker activities and had no plans to resume gainful employment." *Kwapien v. Starr*, 400 N.W.2d 179, 183 (Minn. Ct. App. 1987) (citing *LeMay v. Minneapolis Street Railway Co.*, 71 N.W.2d 826, 831 (1955)). This is because the plaintiff need only prove a loss of earning *capacity*, that is, that an impairment in his or her *power* to earn a living was reasonably certain to occur as a result of the injuries. *Id.*

The plaintiff must prove "the reasonable certainty of future damages by a fair preponderance of the evidence." *Id.* There is no recovery for loss of future earning capacity damages that are speculative, remote, or conjectural. *Carpenter v. Nelson,* 101 N.W.2d 918, 921 (Minn. 1960). An award for impairment of earning capacity should be based on an evaluation of such factors as age, life expectancy, health, occupation, talents, skill, experience, and training. *Kwapien,* 400 N.W.2d at 184.

The jury in this case was provided with information on the employees' ages, past wage rates, and medical histories. An expert testified regarding the percentage of lung impairment suffered by both employees, and the rate at which the impairment would be expected to increase. Conwed presented evidence of the employees' ages and last known wage rates. The record included medical records describing their symptoms through the early 1990s. Under the standard of review and Minnesota law, we conclude that this evidence is sufficient to support the award of loss of future earnings.

D.

Union Carbide also argues that Conwed cannot recover damages for future workers' compensation benefits payable based on projections that existing conditions will worsen. Union Carbide contends that Conwed can only recover where an employee has filed a valid claim and where Conwed has a present duty to pay the employee at the employee's existing level of disability. The district court disagreed, holding that Conwed could recover any benefits it expected to pay in the future based

on existing conditions, including any benefits payable for existing conditions projected to worsen. We agree.

This issue was certified to the Supreme Court of Minnesota. The court held that "to the extent Certified Question No. 1 asks whether, under Minn. Stat. §176.061, Conwed may recover for benefits it has paid or expects to pay following settlements for existing claims based on existing illnesses that may worsen, we answer it in the affirmative." *Conwed Corp.*, 634 N.W.2d at 408. In a footnote, the court clarified that Conwed may not recover damages based on scientific projections regarding the likelihood of the employees' developing wholly new illnesses. *Id*. at 408 n.6. The court thus distinguished between claims based on illnesses that had not yet manifested themselves but were caused by the same exposure, and claims based on existing illnesses that worsened. Conwed could recover for benefits that it expected to pay based on worsening of existing illnesses, but not for wholly new illnesses. *Id.* at 408-09.

This interpretation of *Conwed Corp.* is consistent with a previous decision of the Supreme Court of Minnesota holding that a trial court need not require an employer to commence a separate action as each future workers' compensation claim is made, but rather can make "approximations based on reasonable assumptions" and award a final one-time lump sum based on these predictions. *Wilken v. Int'l Harvester Co.,* 363 N.W.2d 763, 767-68 (Minn. 1985). The employer's subrogation award should be calculated by the trial court, reduced to its present value, and disbursed in a single payment. *Id.* We conclude, therefore, that Conwed may recover benefits paid and payable to its employees for existing conditions that may worsen.

\*          \*          \*

For the foregoing reasons, we affirm the judgment of the district court in large part, but remand with directions to enter judgment in the amount of $23,878.36, rather than $23,465.06.

_____